**REALTY INCOME TRUST**

v.

**Jack ECKERD, in his official capacity as the Administrator of the General Services Administration, et al.,**

**Crosley Building Corporation et al., Appellants.**

**REALTY INCOME TRUST, Appellant,**

v.

**Jack ECKERD, in his official capacity as the Administrator of the General Services Administration, et al.**

**Nos. 76–1062 and 76–1063.**

United States Court of Appeals, District of Columbia Circuit.

Argued 11 Jan. 1977.

Decided 29 June 1977.

Edward C. Berkowitz, Washington, D. C., with whom Joel F. Brenner, Washington, D. C., was on the brief, for appellants.

Glen R. Goodsell, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Realty Income Trust, the appellant, is the owner and operator of two office buildings in downtown Jackson, Mississippi which are rented in significant part to agencies of the federal government. It brought this lawsuit seeking to enjoin the construction of a new federal office building in downtown Jackson into which would be consolidated the various federal agencies in the area, including the agencies located in appellant's buildings.

Its contended ground for relief was that the appellee, the Administrator of the General Services Administration, was proceeding with construction in violation of the National Environmental Policy Act of 1969[1] because it had not filed an environmental impact statement at the time it submitted the proposed project for approval by Congressional Committees. Because it found no merit in appellant's claim, the District Court denied a preliminary injunction and granted appellees' motion for summary judgment, thus allowing construction to proceed. We disagree and find that an environmental impact statement should have been filed with the proposal to Congress.

However, we do not remand to the District Court for relief because we believe that equitable considerations, particular to the facts of this case, do not presently justify an injunction against the ongoing construction of this building, primarily because the necessary environmental impact statements, adequate except for timeliness, have, in fact, been prepared and issued.

## I. LEGAL FRAMEWORK

Under the Public Buildings Act of 1959, as amended by the Public Buildings Amendment of 1972[2], the General Services Administration (GSA) is required to obtain Congressional approval before entering into major leaseholds and purchase-contracts for new federal buildings. The Act directs GSA to submit to the Public Works Committees of the Senate and of the House of Representatives a prospectus describing the

---

1. 42 U.S.C. § 4321 et seq.

2. 40 U.S.C. § 606(a). It reads in part:
 (a) In order to insure the equitable distribution of public buildings throughout the United States with due regard for the comparative urgency of need for such buildings . . no appropriation shall be made to construct, alter, purchase, or to acquire any building to be used as a public building which involves a total expenditure in excess of $500,000 if such construction, alteration, purchase, or acquisition has not been approved by resolutions adopted by the Committee on Public Works of the Senate and the House of Representatives, respectively. No appropriation shall be made to lease any space at an average annual rental in excess of $500,000 for use for public purposes if such lease has not been approved by resolutions adopted by the Committee on Public Works of the Senate and House of Representatives, respectively. For the purpose of securing consideration for such approval, the Administrator shall transmit to the Congress a prospectus of the proposed facility including (but not limited to)—
 (1) A brief description of the building to be constructed; altered, purchased, acquired, or the space to be leased under this chapter
 . . . .

proposed facility. If both Committees approve the project, GSA is then enabled to proceed with the lease or construction without having to go back to Congress for further authorization or appropriation.

The question presented in this case is whether GSA is required to file an Environmental Impact Statement (EIS) on the proposed project at the time it presents the prospectus to the Congressional Committees.

Section 102 of the National Environmental Policy Act of 1969 (NEPA)[3] reads in relevant part as follows:

> The Congress authorizes and directs that, to the fullest extent possible . . . (2) all agencies of the Federal Government shall—(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, [an environmental impact statement] . . . . .

All parties agreeing that the construction of the $25 million office building in Jackson, Mississippi amounts to a major Federal action of environmental significance, the particular NEPA issue here becomes whether the submission of the prospectus is a recommendation or report on a proposal for legislation, requiring a statement, or even if it is not a proposal for legislation, whether the submission is a recommendation or report on a federal action, requiring a statement if sufficiently ripe.

The resolution of these questions involves reference both to the advisory Guidelines issued by the Council on Environmental Quality (CEQ) and to the internal Orders of GSA itself. According to the CEQ, the types of actions covered by NEPA "include but are not limited to . . . (1) Recommendations or favorable reports relating to legislation including requests for appropriations."[4] When an agency acts within the coverage of NEPA, the CEQ Guidelines provide that the EIS, whether draft or final, be available for public and Congressional consideration along with the report or recommendation on the legislative proposal.[5] As for the GSA regulations, its relevant Order at the time contained the equivalent, with more specificity:

> 1. *Determination of what is a "major Federal action significantly affecting the quality of the human environment". . .*
>
> a. Types of major Federal actions requiring environmental impact statements include:
>
> (1) Recommendations or reports relating to legislation with a significant environmental impact, including prospectuses for proposed new Federal buildings under the Public Buildings Act. . . . [6]

Having set out the legal backdrop of this appeal, let us now describe the chronology of events in more detail.

---

**3.** 42 U.S.C. § 4332.

**4.** 40 C.F.R. § 1500.5(a).

**5.** 40 C.F.R. § 1500.12(b). It provides:

> (b) With respect to recommendations or reports on proposals for legislation to which section 102(2)(C) applies, the final text of the environmental statement and comments thereon should be available to the Congress and to the public for consideration in connection with the proposed legislation or report. In cases where the scheduling of congressional hearings on recommendations or reports on proposals for legislation which the Federal agency has forwarded to the Congress does not allow adequate time for the completion of a final text of an environmental statement . . . a draft environmental statement may be furnished to the Congress and made available to the public pending transmittal of the comments as received and the final text.

**6.** GSA Order No. PBS 1095.1B, dated 2 March 1973. In July 1975 GSA updated its order, see 40 Fed.Reg. 27733, but did not appear to change the above definition in any way that affects this case. The order now provides that types of major federal actions requiring an EIS are:

> (1) Recommendations or reports concerning legislation, including requests for appropriations, proposed by GSA or members of Congress resulting in physical action involving, but not limited to proposals for new Federal construction under the Public Buildings Act of 1959 as amended.

## II. BACKGROUND EVENTS

In May 1974 GSA submitted a prospectus to the Public Works Committees of the Senate and House of Representatives. It proposed the acquisition of 277,000 square feet of space for an office building to be constructed in Jackson, Mississippi by a private developer for subsequent lease by the federal government over a 20-year period. No EIS was filed at that time. The Senate Committee held hearings on 30 July 1974 and despite its own rule requiring receipt of an EIS [7] approved the project on 31 July. The House Committee joined in approval on 10 October, both Committees changing the project from a leasehold to a purchase-contract.

On 29 October, less than three weeks after Congressional review, GSA filed a draft EIS with CEQ. The draft statement primarily focussed on the *general* impact from the building on the Jackson area, particularly the downtown, although no specific site had been selected. According to the draft statement, much of the area in downtown Jackson was subject to periodic flooding from a stream known as Town Creek. The draft EIS noted that the Jackson Redevelopment Authority would be seeking to remedy the problem by relocating the Creek into a tube at a cost of about $8 million. Having previously secured Congressional approval for the project, GSA also proceeded with the formal investigation and ranking of possible sites.

On 27 June 1975, prior to the filing of a final EIS by GSA, the Crosley Building Corporation, the original plaintiff, (hereinafter "Realty Trust"),[8] filed its complaint and motion for preliminary injunction in the District Court here. It alleged that it would suffer environmental injury from the construction of the new building due to its impact on vehicular and pedestrian traffic. It also contended that GSA violated NEPA, CEQ Guidelines and its own regulations by failing to file a draft impact statement at the time the prospectus was submitted to the Congressional Committees and sought to enjoin GSA from further action on the project until it complied with NEPA. The complaint stated that the draft EIS would have advised the Committees of certain environmental risks in connection with the project, particularly flooding. As noted, the complaint was accompanied by a motion for preliminary injunction.

In August 1975 GSA filed a final EIS on a site in downtown Jackson that it had selected earlier. The statement described the impact to be expected from the erection of a building on this site, discussed alternatives and contained responses to comments on the draft EIS. In particular, a letter from the Army Corps of Engineers had furnished its evaluation that the proposed Town Creek tube would not be sufficient to control floodflows. According to the final EIS, the building would be additionally protected from flooding by the elevation of curbs and the improvement of drainage. The site selected and adopted in the final EIS was located 1000 feet from the two office buildings owned by Realty Trust.

Following oral argument and the submission of memoranda, the District Court denied a preliminary injunction. As set out in its Findings of Fact and Conclusion of Law,[9] the court regarded the allegations as sufficient to support standing but considered that there was no likelihood that appellant would prevail on the merits. In

---

**7.** Rule 13 of its Rules of Procedure states that: No project or legislation proposed by the Administration shall be approved or other action taken on such project or legislation unless the Committee has received an environmental impact statement relative to it, in accordance with section 102(2)(C) of the National Environmental Policy Act of 1970, and the written comments of the Administrator of the Environmental Protection Agency, in accordance with section 309 of the Clean Air Act.

**8.** The two buildings have changed ownership twice since Crosley Building Corp. began the suit, first to the Milner-Petroleum Buildings, Inc., and now to Realty Income Trust.

**9.** Its order and findings have not been officially reported; they can be found *sub nom. Crosley Building Corporation v. Sampson* at 8 ERC 1430. They are reproduced in the Joint Appendix (J.A. at 55–60).

particular, the court found first that GSA's submission of the prospectus was not a proposal for legislation within the meaning of NEPA. And as to whether the prospectus was otherwise a report on a proposal for major Federal action, the Court found that the proposal was not definite enough to require an EIS. After allowing some preliminary discovery, the District Court granted summary judgment by order in favor of GSA in November 1975 for the "reasons previously described" in the findings denying a preliminary injunction. This consolidated appeal is taken from the adverse orders of the District Court, allowing construction to proceed. Realty Income sought no interim relief from this court, by way of motions for summary reversal or injunction pending appeal. Counsel have advised us at oral argument in January 1977 that the foundation and 5% of the superstructure are constructed, with 1980 as the general goal for completion.

### III. THE NEPA MERITS

As noted, the District Court found no violation of NEPA by GSA because it viewed the submission of the prospectus as neither a recommendation for proposed "legislation" nor a recommendation for a proposed major Federal action of sufficient definiteness. We disagree and believe that on the basis of either rationale an EIS should have been filed with the prospectus. Before turning to the analysis of why

NEPA requires this result, we repeat that the sole question here entails the timeliness of the preparation and filing of the statements in this case, no question being raised on appeal as to the adequacy of their contents.

 We also note at the outset that the District Court appears to have properly found that appellant had standing, on the basis presumably of the "detrimental environmental impact" to appellant that was alleged to result from the erection of the building.[10] Appellees repeat on appeal that despite these allegations, which they did not seek to contest factually, appellant should be denied standing because its only concern, appellees assert, is obviously with the possible loss of rental income from its federal tenants because of the new office building. This argument is without support. Certainly an allegation of injury to monetary interest alone may not bring a party within the zone of environmental interests as contemplated by NEPA for purposes of standing. But a party is not *precluded* from asserting cognizable injury to environmental values because his "real" or "obvious" interest may be viewed as monetary. It is established in this circuit that a party is not "disqualif[ied]" from asserting a legal claim under NEPA because the "impetus" behind the NEPA claim may be economic. *Maryland-National Cap. Pk & Pl. Comm'n v. U. S. Postal Serv.*[11] And it surely does not

---

**10.** Paragraph 7 of the complaint alleges that the new building will cause plaintiff environmental injury due to its effect, among other things, on "vehicular and pedestrian traffic." These allegations may be enough to sustain standing here since NEPA "must be construed to include protection of the quality of life for city residents," *Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir.), *cert. den.*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). *Hanly* noted in particular that "noise, traffic [and] congestion" were all environmental considerations within the purview of NEPA.

**11.** 159 U.S.App.D.C. 158, 166, 487 F.2d 1029, 1037 (1973). *See also Duke City Lumber Co. v. Butz*, 382 F.Supp. 362 (D.D.C.1974), where timber companies were accorded NEPA standing over the Government's objection that their "primary concern [was] with protecting their economic interests rather than [with] tangen-

tial environmental interests," *id.*, at 373 n. 35. On review this court did "not disagree" with the District Court's determination of standing, *Duke City Lumber Co. v. Butz*, 176 U.S.App. D.C. 218, 539 F.2d 220, 221, *cert. den.* 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1976).

In an early case, *Zlotnick v. Redevelopment Land Agency*, 2 ELR 20235 (D.D.C), *aff'd mem.*, 161 U.S.App.D.C. 238, 494 F.2d 1157 (1972), the District Court denied both standing and equitable relief under NEPA to a property owner who sought to stop a project which would take his land, noting that the owner "can at best claim only a remote, insubstantial, highly speculative and ephemeral interest in the environment." It is unclear from the opinion the extent to which the *Zlotnick* plaintiff alleged, if at all, environmental injuries in fact from the purported NEPA defect, which, in retrospect, would have entitled it to standing

square with the broad Congressional purpose in NEPA of assuring that environmental values would be adequately and pervasively considered in federal decision-making for private parties who may not be "pure of heart" to be excluded from vindicating the Act.

■ In denying that an EIS had to be filed with the prospectus, the District Court held, without explanation, that: "In the factual context of this case, the submission of the prospectus by GSA pursuant to 40 U.S.C. § 604, was not a proposal for legislation within the intendment of NEPA." The argument pressed by GSA before the court below and repeated on appeal here is that there is no proposal for legislation in this situation because the prospectus seeks action by resolution from *committees*; "legislation" for NEPA purposes, GSA insists, means "action by both the Senate and House of Representatives." [12] According to this reasoning, which appears to underlie the District Court's conclusion,[13] the submission of the same prospectus, for the same project *would* be "legislation," requiring an EIS, if the Public Buildings Act

required that it be approved by both Houses of Congress subject to Presidential veto, like an ordinary appropriations request. But because final approval rests with two committees, GSA contends, the prospectus is not proposed legislation, requiring an EIS at the time of submission.

For NEPA purposes, this truly appears to be a distinction without a difference. Whatever the exact status of the committee action in parliamentary terms,[14] its role in the statutory scheme of the Public Buildings Act fully implicates NEPA's concerns and goals. Once the Committees give their approval, the GSA *never* has to return to Congress for further authorization or appropriation. It is at a critical juncture like this, when the Committees are weighing the final Congressional judgments about whether to proceed with these projects at all, that the "environmental source material," provided by an EIS, would appear to be particularly needed in the making of relevant decisions.

However, the interest of Congress in making environmentally-informed decisions is not the only interest at stake in the

under *Duke City, supra,* and *Maryland-National, supra.* If there were no injuries alleged to environmental interests, then *Zlotnick* properly stands for the pleading rule that the "zone of interest" under NEPA encompasses environmental values, read, of course, very broadly, but does not encompass monetary interests alone. And, in any event, the affirmance of *Zlotnick* can be explained by recourse to the conventional notion that the granting of injunctive relief, even under NEPA, may turn upon an "assessment of the equities" in the competing interests of the particular case. *See Maryland-National, supra* 159 U.S.App.D.C. at 166, 487 F.2d at 1037.

**12.** GSA Brief at 15.

**13.** There is no indication that the court believed that the prospectus for the proposed project was not "legislation" because it could be described instead as an "appropriation." Other courts have rejected the distinction as immaterial for NEPA purposes, *Environmental Defense Fund v. Tenn. Val. Auth.,* 468 F.2d 1164 (6th Cir. 1972), and have regarded an appropriation request as requiring an EIS, *Save Our Sound Fisheries Ass'n v. Callaway,* 387 F.Supp. 292, 309 (D.R.I.1974). That this distinction was not the rationale below is further suggested by the fact that this same District Judge,

just a few months before the instant decision, held that requests for annual budget appropriations could be proposals for legislation: *Sierra Club v. Morton* (National Wildlife Refuge System), 395 F.Supp. 1187 (D.D.C.1975), *appeal pending sub nom. Sierra Club v. Andrus,* No. 75–1871 (D.C.Cir.). *See also* the CEQ Guidelines, text at n. 4 *supra.*

**14.** A helpful analogy can be found in Judge McCree's analysis of why an *appropriations* request may be a proposal for legislation:

. . . Congress may have valid reasons for distinguishing between "legislation" and "appropriations" for purposes of deciding the proper committee to which to refer a bill or the time or duration of legislative debate. *But that does not require us to close our eyes to* the commonly accepted meaning of the word "legislation—the making or the giving of laws—or to *the clearly expressed congressional purpose of the NEPA. EDF v. TVA, supra* at 1181 (emphasis added).

Conversely, of course, the characterization of this Committee action as "legislation" for NEPA purposes may not necessarily be appropriate in other contexts, *e. g.,* as to the constitutionality of the Committees' function under the Public Buildings Act.

timely filing of an EIS, for Congress has ample means to protect its interest against agency noncompliance. There is also the interest, which the preparation and filing of an EIS help to effectuate, in seeing that the agency itself has considered the environmental issues in this important stage in the decision-making process. *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission.*[15] Finally, the availability of an EIS can allow for a more informed and more effective involvement by the public before the one forum outside of the agency where the decisions whether to build can be influenced.

In short, when it comes to the critical, dispositive review of projects by these Committees under the Public Buildings Act, NEPA calls for the filing of an EIS as much as when an agency submits proposed legislation for action by the entire Congress. It can be said of both situations:

> Congress contemplated that the Impact Statement would constitute the environmental source material for the information of the Congress as well as the Executive, in connection with the making of relevant decisions, and would be available to enhance enlightenment of—and by— the public.[16]

Since one of the purposes of providing for a one-time approval of projects by commit-

tee action alone may be to "expedite" construction,[17] we hasten to add that the requirement of the EIS need not be a "straightjacket" upon the committee process in terms of delay and entanglement. Cf. *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Com'n.*[18] Thus, the entire process leading to a final EIS may not necessarily have to be completed at the time the prospectus is submitted. As the CEQ Guidelines themselves suggest,[19] where time has not allowed for completion of a final text, an agency may furnish instead a draft EIS to Congress along with its proposal for legislation. The obligations of timeliness under NEPA, after all, must be read in light of the same "rule of reason" that applies to obligations of content and analysis under NEPA.[20] But it is an unreasonable reading of NEPA for an agency to submit no environmental impact statement at all to Congress to accompany its proposal and to wait instead, as a matter of policy,[21] until *after* Committee approval before it releases even a draft EIS.

The other NEPA claim brought before the District Court was that the submission of the prospectus, whatever its status as proposed legislation, required the filing of an EIS because it was a recommendation or a proposal for a major federal action. Without disagreeing that the submission was such a proposal the court found that it

**15.** 146 U.S.App.D.C. 33, 42, 449 F.2d 1109, 1118 (1971).

**16.** *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 9, 458 F.2d 827, 833 (1972).

**17.** *See* H.R.Rep.No. 989, 92d Cong., 2d Sess. 3, *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 2370, 2372.

**18.** 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (1973) (content of EIS can flexibly vary, from short, simple analyses to complex multivolume works).

**19.** *See* n. 5 *supra.*

**20.** *Cf. Carolina Environ. Study Group v. United States,* 166 U.S.App.D.C. 416, 418, 510 F.2d 796, 798 (1975) (only "reasonably" foreseeable effects need be described).

**21.** GSA reads its own regulations, *see* text at n. 6, *supra,* as meaning that EIS's should ordinari-

ly be prepared for projects requiring prospectus approval but that the EIS's need not be filed at the time the prospectus is submitted to Congress, Thus, the GSA practice is to wait until "after approval by . . . Committees" before filing the related draft EIS's. J.A. at 44. Such a practice may be literally sustainable under its regulations but serves to foreclose, in violation of NEPA, a full and adequate disclosure of environmental consequences at an important stage in the decision-making process.

In this case, for example, surely the Committees would have been interested in the information in the draft EIS about the existence of a flood plain in the area considered for the project and the remedial plan devised by the city. And also of concern to the Committees might have been the evaluation of the Army Corps that the plan was insufficient and the remedial modifications in the building design.

was not sufficiently definite to require an EIS. In particular, the court noted that at the time of Congressional consideration, GSA had made no "irrevocable commitments" with regard to the building. But surely a proposal under the Public Buildings Act may reach a point of definiteness adequate to allow for a meaningful EIS at some stage prior to the choice of the specific site and the execution of binding contracts. In fact, in this case a draft EIS *was* released shortly after Congressional approval, based entirely upon the general project that had been proposed in the prospectus. Its preparation and filing irrefutably demonstrates that an EIS under the Public Buildings Act does not have to await selection of the final site. Nor can an EIS only be prepared after Congressional approval, as GSA argues,[22] because until approval it does not know for certain how the project will be financed, whether by a purchase contract or leasehold arrangement. Yet GSA totally fails to suggest how the exact method of financing effects the preparation of an EIS, and an examination of the EIS shows that the method of financing was not treated as a material factor at all in terms of impact or alternatives.

In the most recent reading of NEPA, *Kleppe v. Sierra Club*,[23] the Supreme Court tracks the language of Section 102(2)(C) in requiring an EIS "only if there has been a report or recommendation on a proposal for major federal action." And in determining at what point in particular a proposal warrants an EIS, the Court appears to suggest an assessment of what "practical reasons" might justifiably call for delay. In the particulars of that case, the Court noted that there was "no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA."[24]

In contrast, in the instant case, GSA was proposing a specific action, the construction of a \$25 million office building, of known dimensions, to be located in Jackson, Mississippi. That was enough of a factual predicate to allow GSA to prepare a draft EIS; no acceptable justification has been advanced for delaying its preparation and release until after Congressional action. While there had not as yet been an "irretrievable commitment" of resources to a particular site, once the matter had passed through the Congressional committees there was in a real sense an "irretrievable commitment" of federal funds to the project by the preclusion of any opportunity to use those funds in a similar project in a different city. Agencies are afforded some latitude on the timing of EIS's to take due account of their expertise,[25] but with no basis appearing why the EIS must be delayed until after committee approval, we find that GSA acted arbitrarily in not filing an EIS with the prospectus, a recommendation on a proposal for action which warrants an EIS, *Kleppe v. Sierra Club, supra.*

## IV. THE PRESENT EQUITIES

Having found NEPA noncompliance in the failure of GSA to file an EIS at the time it submitted the prospectus, the difficult question remains for this court whether to remand to the District Court for injunctive relief. Such relief would presumably involve the issuance of an injunction against further work on the ongoing construction of the building while GSA sent the impact statements, which have long been completed and publicly released, to the Committees for them to reconsider whether the building should be built at all or wheth-

**22.** GSA Br. at 13.

**23.** 427 U.S. 390, 399, 96 S.Ct. 2718, 2725, 49 L.Ed.2d 576 (1976).

**24.** *Id.* at 402, 96 S.Ct. at 2728. Having found that there was no proposed action in the case before it, the Court additionally noted that an EIS could not be prepared for "practical reasons," *i. e.*, there was "no factual predicate" for

analyzing impact and alternatives. This alternative reasoning suggests that considerations of ripeness or factual sufficiency are still appropriate even when there is an admitted "proposal" for action.

**25.** *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Com'n, supra* 156 U.S.App.D.C. at 410, 481 F.2d at 1094.

er present construction should be delayed.[26] We decline to remand, however, because, for the reasons set out below, we believe that injunctive relief would serve no remedial purpose under NEPA.

■ Ordinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance.[27] The fact that the present project is currently under construction by no means insulates it from the equity power of a court: "The substantial additional costs which would be caused by court-ordered delay" may well be justified by the compelling public interest in the enforcement of NEPA. *Steubing v. Brinegar.*[28] Like injunctive relief generally, however, relief under NEPA must be tailored to *remedy* the particular violations in the case; courts will not issue injunctions under NEPA only as prophylactic or punitive measures. *Cady v. Morton.*[29] A brief review of cases where injunctions have issued will serve both to illustrate the usual remedial rationales and to demonstrate the inappropriateness of injunctive relief here.

The first rationale for injunctions is that a project should not proceed, with its often irreversible effect on the environment, until the possible adverse consequences are known. In affording injunctive relief in one case Judge Friendly observed that if a NEPA analysis were done, it might "*reveal* substantial environmental consequences" which might be critical to further consideration of the propriety of the action.[30] Similarly, another court noted, where an EIS had not been prepared, an injunction is justified against an ongoing project because "the decision makers are entitled to all the information relevant to a determination whether to abandon the project or to alter it."[31] In short, courts will not hesitate to stop projects that are in the process of affecting the environment when the agency is in illegal *ignorance* of the consequences, as when it should have prepared an EIS but failed to do so.

Another reason for enjoining ongoing projects is to preserve for the agency the widest freedom of choice when it reconsiders its action after coming into compliance with NEPA, *e. g.,* after finding out about the possible adverse environmental effects of its action. This rationale often requires an injunction against all the activities of a project, even activities that themselves have no effect on the environment. For, as one court realistically recognized.

[T]he more time and resources [the agency is] allowed to invest in this project, the greater becomes the likelihood that compliance with section 102 of the NEPA, and the reconsideration of the project in light of the provisions of section 101, will prove to be merely an empty gesture.[32]

Behind the insistence on preserving the status quo for the agency, even at the costs of an injunction, is the shared assumption by the courts that *they should not prejudge* the reconsiderations that agencies will make once the full environmental consequences of the action have been determined. As this Court stated, *Jones v. District of Columbia Redevelopment Land*

---

**26.** This was the injunctive relief advised by appellant's counsel at oral argument. Less stringent relief, such as an order that GSA simply transmit the statements now to the Committees for whatever action they may choose to take, will also be seen as purposeless in light of our analysis, *infra.*

**27.** *See Jones v. District of Columbia Redevelopment Land Agency,* 162 U.S.App.D.C. 366, 377, 499 F.2d 502, 513 (1974):

In most cases, perhaps, it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming.

**28.** 511 F.2d 489, 497 (2d Cir. 1975).

**29.** 527 F.2d 786, 799 n. 12 (9th Cir. 1975).

**30.** *City of New York v. United States,* 337 F.Supp. 150, 160 (E.D.N.Y.1972) (three-judge court) (emphasis added).

**31.** *EDF v. TVA, supra* at 1182.

**32.** *Id.* at 1183–84.

*Agency,*[33] "It may be that preparation of the statement will, in the end not move the agency from adherence to decisions it has already made. But it is not for the courts to prejudge." But it may also be true that preparation of an EIS will, in the end, move an agency to a fresh and a different rebalancing of the costs and benefits of its previous decisions, thus vindicating the refusal to prejudge.[34]

The decision in each case whether the preservation of an agency's options upon reappraisal justifies the costs of delay rests, of course, in the sound discretion of the court. Where the countervailing equities are exceptional, as where "further delay might injure our nation's defense posture," *Concerned About Trident v. Rumsfeld,*[35] the action may be allowed to proceed, although the obligation to "rethink" the decision upon NEPA compliance remains as strict if not stricter. But, as noted at the outset, the presumption is that an action proceeding in violation of NEPA should be enjoined, so that the momentum of additional work and investment does not serve further to bind the agency to its initial decision.

 Judged by the reasons for injunctive relief described above, it becomes apparent that relief would serve no remedial purpose in this case. The problem here, to repeat, was simply one of timing, that is, that there was not a timely filing of an EIS with Congress. No complaint remains on appeal that the statements in substance were inadequate in any way. Moreover, we

repeat, the final EIS was prepared and released before any construction was actually begun on the site. Whatever adverse environmental impact there would be from the project, ensuing from the construction of the building, was presumably investigated by the agency and disclosed beforehand in the EIS. Thus, action having a significant effect on the environment did not commence and is not proceeding in ignorance of possible adverse consequences. This is not a situation where a project has to be stopped so that an undone NEPA analysis can be prepared which might "reveal" hitherto unknown environmental consequences or which might discuss hitherto unexplored alternatives. The first rationale for enjoining ongoing construction thus does not apply.[36]

The second rationale, that further investment will prejudice agency reappraisal, also does not apply. As noted, this rationale rests on the courts' reluctance to prejudge an agency's reappraisal once an adequate EIS is prepared. In this case, however, the agency made the decision to proceed to the construction with the benefit of an adequate EIS. There is simply no fresh reappraisal for GSA to make, the EIS now being the same EIS it had earlier.

The more difficult question comes with respect to the Congressional Committees, but the same logic essentially applies. The Committees, as noted, made their decision to approve the project without the availability of an EIS. Had *no* EIS ever been prepared, we might be reluctant to pre-

**33.** *Supra* 162 U.S.App.D.C. at 376, 499 F.2d at 512. *See also Jones v. Lynn,* 477 F.2d 885, 891 (1st Cir. 1973).

**34.** CEQ provides some of the following examples:

> The Corps of Engineers decided to drop or abandon work on over a dozen proposed projects because its NEPA process revealed that significant environmental damage would result . . . .. The Corps has also modified many more due in large part to NEPA and the EIS requirement . . . .. [Similarly, the Department of Transportation] estimates that since 1970, scores of major projects have been abandoned or changed as a result of the EIS process and a determination to avoid adverse effects.

CEQ, Sixth Annual Report 629 (December 1975).

**35.** 180 U.S.App.D.C. 345 at 359, 555 F.2d 817 at 831 (1976) (Leventhal, J., for the Court).

**36.** The focus here on ensuring that actual environmental impacts are not incurred without an awareness and disclosure of the consequences *does not* mean that equitable relief under NEPA can only issue when actual environmental impacts are imminent. The concern for the *decision-making process under NEPA may well* justify equitable relief at earlier stages. *See Jones v. District of Columbia Redevelopment Land Agency, supra* 162 U.S.App.D.C. 375–376, 499 F.2d at 511–12.

judge whether the Committees might wish to stop or abandon the project, even this far into construction, once they knew of the expected impacts and the possible alternatives. But, of course, an adequate EIS. was prepared and filed with the CEQ twice, in draft and final form, accompanied by the requisite public notice.[37] The draft EIS was made publicly available in October 1974 and the final EIS in August 1975; to our knowledge, there has never been any committee reaction of any kind, in terms of reconsideration or modification, once the environmental consequences of the project were disclosed, although the Committees were surely empowered to react if they wished.

This is not to say that the Committees' inaction in any way amounts to a legal ratification of GSA's violation of NEPA.[38] But, rather, it suggests that equity should not require the doing of a "vain or useless thing" by directing the submission to the Committees of the statements that have been public between two and three years and by enjoining GSA from continuing the project until the Committees decide whether to finish it.

This court has recognized before that with regard to NEPA defects of timing, equitable intervention after the fact, after the EIS *is* done and the decision *has* been made, must adjust itself to the realities of the situation:

> We deem it important to recognize that, once decisions have been made, it may, as a practical matter, be impossible to duplicate the kind of staged infusion of environmental information and consideration that NEPA contemplates.[39]

On this appeal, then, we are reversing the orders of the District Court to the extent they held that there was no violation of NEPA but we are declining to remand because at this point injunctive relief appears to be inappropriate.

*So Ordered.*

---

**37.** Notices of the filing of both the draft and the final EIS were published in the Federal Register. The draft EIS also indicates that copies were sent to the two Senators for Mississippi and the Representative from Jackson. The court in *Concerned About Trident, supra,* 180 U.S.App.D.C. at 354 n. 22, 555 F.2d at 826 n. 22 (Tamm, J., for the court), took note of the "availab[ility]" of EIS's to Congress and the public on account of public filings.

**38.** Congressional approval of appropriations measures has not been read as a conclusive determination of the sufficiency of related impact statements. *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971). Similarly, Committee approval of the prospectus without the availability of an EIS does not mean that an EIS did not have to be filed with the prospectus.

**39.** *Jones v. District of Columbia Redevelopment Land Agency, supra* 162 U.S.App.D.C. at 378, 499 F.2d at 514.