**POTOMAC ALLIANCE, Petitioner,**

v.

**UNITED STATES NUCLEAR REGULA-TORY COMMISSION and United States of America, Respondents,**

**Virginia Electric and Power Company, Intervenor.**

No. 80–1862.

United States Court of Appeals, District of Columbia Circuit.

Argued June 17, 1981.

Decided July 20, 1982.

James B. Dougherty, Washington, D. C., for petitioner.

Marian E. Moe, Atty., Nuclear Regulatory Com'n, Washington, D. C., with whom Anne S. Almy, Thomas H. Pacheco, Attorneys, U. S. Dept. of Justice, and Stephen F. Eilperin, Sol., U. S. Nuclear Regulatory Com'n, Washington, D. C., were on the brief, for respondents.

James W. Moorman, Atty., U. S. Dept. of Justice, Washington, D. C., also entered an appearance for respondents.

James N. Christman, Richmond, Va., with whom Michael W. Maupin and James M. Rinaca, Richmond, Va., were on the brief, for intervenor.

Before BAZELON and McGOWAN, Senior Circuit Judges, and WILKEY, Circuit Judge.

Opinion PER CURIAM.

Separate Concurring Opinion filed by Senior Circuit Judge BAZELON.

PER CURIAM:

Petitioner Potomac Alliance seeks review of a decision of the Nuclear Regulatory

Commission (NRC) amending an operating license to authorize Virginia Electric Power Company (VEPCO) to increase the storage capacity of the spent fuel pool at its North Anna Nuclear Power Station. Petitioner claims that the NRC violated the requirements of the National Environmental Policy Act (NEPA)[1] in failing to consider, prior to granting the requested amendment, the long-range future effects of permitting the increased storage capacity, including the situation as it will exist on the date of the plant's permanent closing in 2011.

We note that this same issue has, heretofore in the recent past, been raised in, and addressed by, this court. In *Minnesota v. NRC*, 602 F.2d 412 (D.C.Cir.1979), this court, on virtually an identical set of facts, found itself unable to sustain, as against a claim of NEPA violation,[2] an NRC order amending an operating license to expand spent fuel storage capacity, absent a meaningful exploration by the agency of the dangers presented by the continuing existence of the storage pool after the final closing date of the plant, and a finding based thereon that either (1) a satisfactory solution is presently available or (2) there is a reasonable probability of such availability by the shut-down date. This is precisely what the NRC failed to do in the case before us. Mindful of our rules with respect to the maintenance of uniformity in dispositions of like cases by different divisions of this court, we conform the result we reach in this case to that one.

In *Minnesota*, the court, despite the apparent NEPA violation, declined to vacate or stay the license amendment in question, indicating instead that the Commission was free to proceed with consideration of the effects of modifying the spent fuel storage capacity by such means as it might deem effective to that end. The court was careful to say that it did not contemplate that a trial-type adjudicatory proceeding was required, and it suggested the appropriateness of the generic rulemaking which the NRC had professed to have in view. Adopting the court's suggestion, on August 2, 1979, the NRC noticed a generic proceeding to reassess the outlook for the availability of safe nuclear waste disposal methods, focusing on the specific question raised by the *Minnesota* court. This rulemaking, termed by the Commission the "Waste Confidence" proceeding, is currently continuing. Therefore, as in *Minnesota*, we decline to vacate or stay the challenged license amendments.

The Commission has recently informed the court, in response to a specific inquiry by it after this case was taken under submission, that

> [t]he earliest that the proceeding might conclude and a decision issue would be about six months after the January 1982 oral presentations, but it is possible that a year or more might pass before a final Commission decision could be reached.

NRC Response to Request Concerning Status of Waste-Confidence Proceeding, at pp.

---

1. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976), provides in part that

   all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement ... on

   (i) the environmental impact of the proposed action, [and]

   (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and]

   .    .    .    .    .

   (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

2. Petitioner in *Minnesota* raised challenges based both on NEPA and on the Atomic Energy Act. Potomac Alliance also argues before this court that the Commission violated the Atomic Energy Act by approving the license amendment without a prior finding of "reasonable assurance[ ] that the modification of the North Anna spent fuel pool for long term storage would not endanger the public health and safety." Appellant's Br. at 21. This claim was not, however, raised before the Appeal Board or the Commission and may not be raised for the first time here. *Cf. Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

2–3. Implicit, however, in the disposition by the panel in *Minnesota* was the assumption that the NRC would proceed as expeditiously as possible.

Under these circumstances, and taking into account the lengthy period of time that has elapsed since *Minnesota*, as well as the scientific and technical difficulties that appear to characterize this problem, we think an appropriate response to the NRC's latest progress report is for us to assert that its failure to act by June 30, 1983, will place in jeopardy the expanded authority at issue in this case.

The case is remanded to the NRC for further proceedings and consideration consistent with the purposes of this remand.

*It is so ordered.*

BAZELON, Senior Circuit Judge, concurring:

I concur fully in the court's opinion in this case. I write separately, however, to illuminate the substantive issues underlying our *per curiam* disposition.

### BACKGROUND

In 1971, when the Nuclear Regulatory Commission (NRC) authorized the construction of VEPCO's North Anna power plant, the Commission also authorized the construction of an on-site pool for used or "spent" fuel assemblies.[1] At the time, both the NRC and the Virginia Electric and Power Company (VEPCO) expected the pool to be used to cool spent fuel assemblies for periods of five months, after which time the assemblies would be shipped to an off-site reprocessing or storage facility.[2] As originally constructed, the North Anna spent-fuel pool could hold 400 spent fuel assemblies, more than would have had to be stored in the pool at any one time if the anticipated off-site facilities had been developed.[3] Such facilities, however, have not been developed and the North Anna spent-fuel pool has become a *de facto* mid-term nuclear waste repository, and may yet become a long-term repository.[4] As a result, the storage capacity of the spent-fuel pool has come to impose an impending constraint on the continued operation of the plant. Once the pool is full, and the last fuel assembly in the reactor is spent, the reactor cannot be refueled and the plant will have to shut down.

From virtually the beginning of the North Anna plant's operating life,[5] VEPCO recognized the critical function that the

---

1. A fuel assembly is a bundle of approximately 200 long thin fuel rods containing the enriched uranium pellets that fuel the fission reaction. A typical reactor core is comprised of about 157 assemblies. When the fuel elements of the core have expended much of their available energy content, they cannot maintain an efficient chain reaction. Therefore, they must be removed from the reactor and replaced with new assemblies. At the time the spent fuel assemblies are removed from the reactor, they are intensely radioactive and physically hot. To allow for radioactive decay as well as physical cooling, the assemblies are placed in a "spent-fuel pool" adjacent to the reactor. The spent-fuel pool is a deep reinforced concrete basin that is lined with stainless steel and filled with water. At the bottom of the pool, there are long stainless steel sleeve-like racks that hold the assemblies vertically under the water. The water serves both to cool the assemblies and to absorb the radiation that they emit.

2. Environmental Impact Appraisal by the Office of Nuclear Reactor Regulation Relative to a Proposed Increase in Storage Capacity of the Spent Fuel Pool, North Anna Power Stations, Units 1 and 2, Virginia Electric and Power Company, Docket Nos. 50–338 and 50–339, Facility Operating License No. NPF–4 (April 2, 1979) p. 2 [hereinafter EIA], Joint Appendix (J.A.) at 65, 69.

3. VEPCO's original license allows 416 spent fuel assemblies to be stored in the spent-fuel pool. As initially constructed, however, the racks in the pool would only accommodate 400 assemblies.

4. This new-found role of the spent-fuel pool is not unique to the North Anna plant. Nuclear facilities throughout the country have come to depend on their on-site spent-fuel pools as *de facto* repositories due to the absence of off-site waste-management facilities.

5. The NRC granted VEPCO an operating license for Unit No. 1 of the North Anna plant on November 26, 1977, and it granted VEPCO an operating license for Unit No. 2 on August 21, 1980. The spent-fuel pool is used for both units.

spent-fuel pool would serve, and on May 1, 1978, it applied for an amendment to its operating license that would allow an expansion of the pool's capacity to 966 spent fuel assemblies.[6] VEPCO proposed to increase the pool's capacity by replacing the original storage racks with new, more closely spaced racks.[7] The pool itself was to remain the same size. Without this modification, VEPCO predicts that the North Anna plant would be able to continue full operation only until the end of 1984.[8]

In reviewing VEPCO's application, the Atomic Safety and Licensing Board analyzed the need for increased storage capacity at North Anna, alternatives to the proposed expansion, and the environmental effects of the expansion through the year 2011.[9] The Board limited its environmental analysis to pre-2011 environmental effects because the plant's operating license expires in 2011. On the basis of its analysis, the Board concluded that "the proposed license amendment will not significantly affect the quality of the human environment and that there will be no significant environmental impact attributable to the proposed action other than that which has already been predicted and described in the Final Environmental Statement dated November 1973."[10] The Licensing Board also concluded that the alternatives to expanding the pool's capacity were either infeasible or environmentally less desirable.

On January 29, 1979, the Potomac Alliance was granted leave to intervene in North Anna's licensing proceeding,[11] and on June 15 of that year, the Alliance moved to introduce the issue of post-2011 environmental effects into the Licensing Board's determination of environmental significance. The Alliance argued that NEPA requires the Licensing Board to consider the environmental consequences of the proposed amendment over the entire time period during which the pool might be used for spent-fuel storage—even if that period extended beyond the operating life of the plant. Specifically, the Alliance contended that, under NEPA, the Board was obliged to undertake a two-step inquiry before approving the amendment: First, the Board needed to assess the possibility that the additional spent fuel contemplated by VEPCO's proposal would remain in the on-site pool beyond the year 2011. If, at the time the proposal was evaluated, that contingency appeared "reasonably foreseeable," the Board was then required to consider its likelihood and environmental impact. In August 1979, however, the Board declined to consider the possibility of such a long-

---

6. According to the NRC, 59 license amendments have been granted to expand on-site storage capacity at 62 power plants. 52 of those amendments predated this court's decision in *Minnesota v. NRC*, 602 F.2d 412 (D.C. Cir.1979). *See* section II–C *infra*. In addition there are currently nine applications pending to expand spent-fuel pools, not including the one at issue in this case. *See* NRC brief at 4–5.

7. The original racks held spent fuel assemblies 21 inches apart, while the new racks would hold the assemblies 14 inches apart.

8. VEPCO brief at 10. VEPCO predicts that if it could only store 416 spent fuel assemblies in the North Anna spent-fuel pool, Unit No. 2 would be able to continue full-power operation until November 1984 and Unit No. 1 would be able to continue until May 1985. After May 1983, however, 416 fuel assemblies will be in the spent-fuel pool, which would mean that the fuel in the reactors would have to remain there until alternative storage facilities become available.

able. VEPCO states that this would not present any safety problems, but that it would make repairs and maintenance more difficult. Ideally, space is left open in the spent-fuel pool so that fuel assemblies can be removed temporarily to facilitate maintenance.

VEPCO applied for the license amendment far in advance in order to replace the storage racks before any spent fuel assemblies are placed in the pool and thereby avoid radiological risks that otherwise would threaten the workers replacing the racks.

9. EIA, *supra* note 2.

10. *Id.* at 28, J.A. 95. The 1973 Final Environmental Statement analyzed the full impact of the plant.

11. Potomac Alliance's intervention petition was granted by the Commission's Appeal Board on January 29, 1979, overruling a Licensing Board ruling to the contrary.

term impact and approved VEPCO's license amendment.[12] The Potomac Alliance thereafter appealed the Licensing Board's decision to the Commission's Appeal Board but did not seek a stay pending the outcome of its appeal. VEPCO, therefore, proceeded with the expansion of the pool, completing the job on September 11, 1979, and placing the first load of spent fuel assemblies in the storage pool on October 17, 1979. Ultimately, the Appeal Board affirmed the Licensing Board's decision and the Commission itself denied review.[13] The Potomac Alliance now seeks review of the NRC's action in this court.

## II. ANALYSIS

The NRC does not claim that its environmental assessment satisfied NEPA. Instead, the Commission argues that this court's decision in *Minnesota v. NRC*[14] authorized it to approve VEPCO's license amendment without considering the post-2011 environmental effects of doing so. This court has concluded that the NRC violated the National Environmental Policy Act (NEPA) by failing to consider the possibility that the expansion of the North Anna spent-fuel pool will result in additional nuclear waste remaining in the pool, and causing environmental damage, beyond 2011. Furthermore, the court has rejected the NRC's reading of *Minnesota* as providing blanket authority for its approval of spent-fuel pool expansions without a complete environmental assessment.

**12.** Order Denying Intervenors' Motion to Amend Petition to Intervene, Atomic Safety and Licensing Board, August 17, 1979, J.A. at 61; Order Granting VEPCO's Motion for Summary Disposition, Atomic Safety and Licensing Board, August 24, 1979. J.A. at 38.

**13.** *Virginia Electric and Power Co.* (North Anna Nuclear Power Station, Units 1 and 2), ALAB–584, 11 N.R.C. 451 (1980), J.A. at 1.

**14.** 602 F.2d 412 (D.C.Cir.1979).

**15.** 42 U.S.C. § 4332(2)(C) (1976).

### A. *Standard of Review*

The present controversy centers on the NRC's compliance with section 102(2)(C) of NEPA, which provides:

The Congress authorizes and directs that, to the fullest extent possible ... all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action, [and]

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and]

\*   \*   \*   \*   \*   \*

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.[15]

As the Supreme Court has emphasized, these provisions impose on the agencies duties that are "essentially procedural."[16] The particular duty involved in this case arises out of the agency's obligation to determine whether an action "significantly affect[s] the quality of the human environment."[17] That obligation imposes on the agency an essentially procedural duty[18] to consider the environmental effects of a proposed action.[19] Our role, as established by the Administrative Procedure Act, is to determine whether the NRC made the decision now under review "without observance

**16.** *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). *See also North Slope Borough v. Andrus,* 642 F.2d 589, 598 (D.C.Cir.1980) (NEPA's requirements are "procedural in character").

**17.** 42 U.S.C. § 4332(2)(C) (1976).

**18.** *NRDC v. SEC,* 606 F.2d 1031, 1044 (D.C.Cir. 1979).

**19.** *Calvert Cliffs' Coordinating Comm., Inc. v. AEC,* 449 F.2d 1109, 1118 (D.C.Cir.1971).

of procedure required by law." [20] We may not substitute our own judgment for that of the NRC. Whether the benefits of expanding the North Anna spent-fuel pool outweigh the costs is a question we are ill-equipped and unauthorized to answer. Our limited objective, therefore, is to determine what procedures NEPA requires and whether the NRC has followed them.[21]

## B. *NEPA*

The starting point in any analysis of an agency's compliance with section 102(2)(C) of NEPA is the "rule of reason," [22] under which a federal agency proposing a major action must consider only the reasonably foreseeable environmental effects of the action.[23] If, after considering such prospective effects, the agency finds that the proposed action will not "significantly affect[ ] the quality of the human environment," [24] then its obligation under section 102(2)(C) is satisfied, and it may proceed with the action. If, on the other hand, the agency cannot make a finding of insignificance, it must consider the environmental impact of the proposed action in greater detail and

issue a detailed environmental impact statement before it may proceed. In this case, the NRC considered all environmental effects of VEPCO's license amendment through the year 2011 and concluded that the amendment would not significantly affect the environment. The only issue for this court to decide, therefore, is whether the NRC properly terminated its environmental consideration without assessing the possibility that there will be any post-2011 effects of the amendment.[25]

The primary feature of VEPCO's license amendment is its provision allowing 966 rather than 416 spent fuel assemblies to be stored in the North Anna spent-fuel pool.[26] As a result of the amendment, the extra 550 fuel assemblies, along with the initially authorized 416, will remain in the pool until off-site waste-management facilities are developed, posing a possible environmental threat that continues as long as they are left there. Were it not for the license amendment, of course, those extra 550 spent fuel assemblies could not pose such a threat.[27] It follows that the time frame of

**20.** 5 U.S.C. § 706(2)(D) (1976). *See NRDC v. SEC*, 606 F.2d 1031, 1048 (D.C.Cir.1979); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973); W. Rogers, Environmental Law 716–17 (1977).

**21.** This circuit has long held that courts must exercise heightened scrutiny of agencies' compliance with NEPA's procedures. *See, e.g., Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1092 (D.C.Cir.1973); *Calvert Cliffs' Coordinating Comm., Inc. v. AEC*, 449 F.2d 1109, 1115 (D.C.Cir.1971). In *Calvert Cliffs*, we stated that "the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by a reviewing court." 449 F.2d at 1114.

**22.** *NRDC v. Morton*, 458 F.2d 827 (D.C.Cir. 1972).

**23.** *Carolina Environmental Study Group v. United States*, 510 F.2d 796, 798 (D.C.Cir.1975); *Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1092 (D.C.Cir.1973).

**24.** 42 U.S.C. § 4332(2)(C) (1976).

**25.** Radioactive wastes that are generated by a nuclear power plant, like smoke that is produc-

ed by a coal-fired plant, are inextricable by-products of the plant's operation. As such, the environmental effects of storing or disposing of those wastes must be considered before a plant may be licensed to produce them. In concluding that the NRC must consider the environmental effects of waste management prior to licensing a nuclear power plant, the Supreme Court has stated that "[i]t is hard to argue that [nuclear] wastes do not constitute 'adverse environmental effects which cannot be avoided should the proposal be implemented,' or that by operating nuclear power plants we are not making 'irreversible and irretrievable commitments of resources.' " *Vermont Yankee Nuclear Power Corp. v. NRC*, 435 U.S. 519, 539, 98 S.Ct. 1197, 1209, 55 L.Ed.2d 460 (1978) (citations omitted).

**26.** Technically, the amendment changed the license in two respects: It decreased the minimum distance between stored fuel assemblies; and it increased the maximum number of assemblies allowed to be stored in the pool.

**27.** Intervenor VEPCO claims that the license amendment "does not extend the time that fuel assemblies may be stored at the site by a single day." VEPCO brief at 3. What VEPCO apparently means is that a new license amendment would be needed in the year 2011 if the spent-

a complete environmental assessment would have to extend throughout the period in which the spent fuel could, under reasonably foreseeable circumstances, remain in the North Anna pool. Such an assessment would necessarily include an analysis of the likelihood that off-site waste-management facilities will be available by the year 2011. If the NRC were to find it reasonably foreseeable that off-site facilities will not be available, then the NRC would have to assess the environmental implications of leaving the additional spent fuel in the pool until such facilities become available.

Anything less would fail to satisfy the mandate of NEPA; for not only does section 102(2)(C) of NEPA generally contemplate comprehensive environmental review, but particular provisions of the Act explicitly mandate concern for the long run. Section 102(2)(C) itself requires agencies that propose major actions that will significantly affect the environment to consider and disclose "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity."[28] Moreover, section 101(b), which articulates the ultimate purposes of NEPA's procedural requirements, establishes the federal government's continuing responsibility to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."[29]

The NRC, therefore, can justify truncating its environmental assessment at the year 2011 only if it has found that no reasonably foreseeable contingency exists under which the spent fuel assemblies will

remain in the pool beyond that time. Because the agency has not even attempted to make such a showing, we can only conclude that the approval of VEPCO's amendment violated NEPA.

This court addressed a similar problem in *Concerned About Trident v. Rumsfeld.*[30] In that case, the Navy had assessed the environmental effects of a proposed submarine base for only the first seven years after construction began. Because the Navy had not shown that all significant environmental effects would cease after seven years, the court found the abbreviated environmental assessment wholly inadequate. As we stated in that case, such short-sightedness "fails to ensure that the environment will be preserved and enhanced for the present generation, much less our descendants."[31]

The fact that the spent fuel at issue in this case may not—or even, probably will not—remain in the North Anna storage pool beyond 2011 does not allow the NRC to ignore any reasonably foreseeable possibility that it will. It is well recognized that a lack of certainty concerning prospective environmental impacts cannot relieve an agency of responsibility for considering reasonably foreseeable contingencies that could lead to environmental damage.[32] Many ultimate impacts on the environment are the result of prospectively uncertain, unlikely, contingent events, and while an agency cannot be asked to engage in a "crystal ball" inquiry or to "foresee the unforeseeable,"[33] neither can it be allowed to abjure "in-

fuel pool were to continue being used as a waste repository. In the context of a NEPA review, however, this claim is somewhat disingenuous; for if no satisfactory off-site facilities are available in 2011, there will be little choice but to leave the spent fuel assemblies in the pool. As far as 550 of those assemblies are concerned, therefore, the decision to leave them in the pool beyond 2011 would have been effectively made when the present license amendment was approved.

**28.** 42 U.S.C. § 4332(2)(C)(iv) (1976).

**29.** 42 U.S.C. § 4331(b)(1) (1976).

**30.** 555 F.2d 817 (D.C.Cir.1977).

**31.** 555 F.2d at 830.

**32.** *See, e.g., Izaak Walton League of America v. Marsh,* 655 F.2d 346, 377 (D.C.Cir.1981); *Alaska v. Andrus,* 580 F.2d 465, 473 (D.C.Cir.), *vacated, in part, sub nom. Western Oil & Gas Assoc. v. Alaska,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); *Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 830 (D.C.Cir.1977). *Scientists' Institute for Public Information, Inc. v. AEC,* 481 F.2d 1079, 1092 (D.C.Cir.1973).

**33.** *Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 830 (D.C.Cir.1977).

formed prediction" of possibilities.[34] When confronting a set of uncertain environmental effects, an agency's goal must be to trace each reasonably foreseeable contingency and determine, first, the likelihood of its occurring, and second, the environmental damage that would result should it occur. Of course, precision in this context can only be the ideal, and where an agency's analysis is constrained by the availability of information or by technical feasibility, NEPA requires only that the agency disclose that which is unknown.[35] At the threshold stage of the NEPA inquiry, however, an agency must determine, to the extent feasible, whether the sum of all reasonably foreseeable effects, discounted by the probability of their occurrence, represents a "significant" effect on the environment. If it does, then the agency must issue an EIS analyzing the probabilistic facets of the prospective environmental impact.[36]

## C. Minnesota v. NRC

The NRC argues that Minnesota eliminated any obligation it may have had under NEPA to consider the possibility that nuclear waste will remain in a spent-fuel pool beyond the point at which a nuclear plant is expected to shut down. Minnesota v. NRC[37] involved two consolidated license amendments similar to the one at issue here.[38] As in this case, the NRC had limited its environmental review to the period covering the operating lives of the plants. In contrast to the present case, however, the licensing boards and the Appeal Board in Minnesota, explicitly found that the

spent-fuel pools would not be used beyond the time that the plants were expected to shut down. On the basis of that finding, the Appeal Board ruled that the NRC staff was correct in limiting its environmental assessment to the period over which the plant would remain in operation. In reviewing the Appeal Board's decision for compliance with both NEPA and the Atomic Energy Act, this court focused upon the Board's conclusion that no spent fuel assemblies would remain in the spent-fuel pool beyond the time at which the plant would shut down. The court found that this forecast was based solely on a prior Commission decision denying a petition for a rulemaking to determine whether nuclear waste can be stored and disposed of without undue risk to the public health and safety.[39] In that decision, the Commission had asserted its "reasonable confidence that the wastes can and will in due course be disposed of safely." [40] Because that "confidence," however, was not the product of a rulemaking record,[41] the court remanded the case to the NRC for further consideration. In doing so, the court directed the Commission to consider

> the specific problem isolated by petitioners—determining whether there is reasonable assurance that an off-site storage solution will be available by the years 2007–09, the expiration of the plants' operating licenses, and if not, whether there is reasonable assurance that the fuel can be stored safely at the sites beyond those dates.[42]

---

34. *Alaska v. Andrus*, 580 F.2d 465 (D.C.Cir.), vacated in part, sub nom. *Western Oil & Gas Assoc. v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

35. *Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1092 (D.C.Cir.1973).

36. The detail in which an agency must consider the likelihood and nature of each contingency is somewhat flexible. If a contingency is highly unlikely to occur or the potential harm that it entails is not severe, less detail is required. *See Izaak Walton League of America v. Marsh*, 655 F.2d 346, 377 (D.C.Cir.1981).

37. 602 F.2d 412 (D.C.Cir.1979).

38. *See Vermont Yankee Nuclear Power Corp.* (Vermont Yankee Nuclear Power Station), LBP–77–54, 6 N.R.C. 436 (1977); *Northern States Power Co.* (Prairie Island Nuclear Generating Plant, Units 1 and 2), LBP–77–51, 6 N.R.C. 265 (1977).

39. 602 F.2d at 417.

40. 42 Fed.Reg. 34393 (1977).

41. 602 F.2d at 417.

42. 602 F.2d at 418.

In the course of its decision, the *Minnesota* court noted that the NRC was in the process of conducting a generic proceeding in which the issue of long-term waste storage was of central concern. The court stated that the Commission could carry out its responsibilities on remand within the context of the ongoing proceeding, in a separate generic proceeding, or in any other manner it deemed appropriate.[43] However, despite its implicit conclusion that the NRC had approved the license amendments without complying with either NEPA or the Atomic Energy Act,[44] the *Minnesota* court declined to vacate or stay the license amendment.[45]

The Commission points out that in response to this court's remand in *Minnesota*, it began a rulemaking to

> assess generically the degree of assurance now available that radioactive waste can be safely disposed of, to determine when such disposal or off-site storage will be available, and to determine whether radioactive wastes can be safely stored on-site past the expiration of existing facility licenses until off-site disposal or storage is available.[46]

That rulemaking, referred to as the "Waste Confidence" proceeding, is still in progress, and the Commission has given little indication of when it will come to a conclusion.[47] The Commission, nevertheless, argues that as long as the proceeding is under way, it may continue to approve the expansion of spent-fuel pools' capacity without considering either the prospect of developing off-site waste-management facilities or the environmental consequences of using on-site storage pools as long-term repositories.

The essential problem with the NRC's argument is its limitlessness. Certainly, the NRC cannot contend that *Minnesota* afforded it an unbounded time period in which to hold generic proceedings, and to continue to authorize the expansion of on-site storage pools without considering the long-term environmental consequences of such expansions. There is nothing in *Minnesota* to support such a position. The *Minnesota* court found that the NRC had approved license amendments for two plants in violation of NEPA and the Atomic Energy Act, but, as a matter of equity, the court chose not to order the shut-down of the plants pending the Commission's compliance. Although the balance of equities in a similar situation arising within a reasonable amount of time after *Minnesota* would continue to weigh against forcing a plant to

---

**43.** 602 F.2d at 419 n.10.

**44.** Judge Tamm, concurring separately, was quite explicit on this point. He stated that

> section 102(2)(C) of the National Environmental Policy Act of 1969 and section 103(d) of the Atomic Energy Act of 1954 mandate the determination that the Commission identified in this case. In addition, if the Commission determines it is not reasonably probable that an offsite waste disposal solution will be available when the licenses of the plants in question expire, it then must determine whether it is reasonably probable that the spent fuel can be stored safely onsite for an indefinite period. Answers to these inquiries are essential for adequate consideration of the safety and environmental standards of the relevant statutes. It is undisputed that questions involving storage and disposal of nuclear waste pose serious concerns for health and environment.

602 F.2d at 419 (footnotes and citations omitted).

The NRC asserts that the court in *Minnesota* "refrained from deciding either the NEPA or the Atomic Energy Act questions that were before it." NRC brief at 16. Although it is true that the court did not explicitly analyze the requirements of either act, the fact that the court remanded the case to the Commission indicates that the court found an underlying violation of law. Otherwise, there would be no grounds for the remand.

**45.** 602 F.2d at 418.

**46.** Storage and Disposal of Nuclear Waste, 44 Fed.Reg. 61372 (October 25, 1979).

**47.** In response to a post-argument inquiry of this court, the NRC stated that "[t]he earliest that the proceeding might conclude and a decision issue would be about six months after the January 1982 oral presentations, but it is possible that a year or more might pass before a final Commission decision could be reached." NRC Response to Request Concerning Status of Waste-Confidence Proceeding.

shut down, that balance can change as time goes on and as the particular circumstances of different cases vary.[48] This court has determined that, as of now, the balance of equities still weighs against enjoining VEPCO from storing additional waste in the North Anna spent-fuel pool. The court has also determined, however, that after June 30, 1983, the balance of equities in a case like the present one may well shift. After that point, the mandate of *Minnesota* will no longer stand as blanket authority for the NRC to avoid considering the long term impact of license amendments like the one at issue in this case.[49]

[48]. In addition, the *Minnesota* court concentrated primarily on the public health and safety standard of the Atomic Energy Act, and not on the procedural requirements of NEPA, which it characterized as less rigorous "in certain aspects." 602 F.2d at 418 n.8. This court expresses no view on the mandate of the Atomic Energy Act. To the extent that the requirements of that act differ from those of NEPA, however, it may be that the Commission can reasonably be expected to comply with NEPA—either generically or on a case-by-case basis—in a shorter period of time than it must take to comply with the Atomic Energy Act. As stated above, NEPA requires informed prediction where feasible, but where the information needed for such prediction cannot be uncovered, an agency's candid description of what remains unknown will usually suffice. *See* p. 1036 & note 32.

[49]. For general discussions of the factors governing the remedy decision in the context of NEPA violations, *see Alaska v. Andrus*, 580 F.2d 465, 485–87 (D.C.Cir.), *vacated in part, sub nom. Western Oil & Gas Ass'n v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456–58 (D.C.Cir.1977); *Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502, 512–14 (D.C.Cir.1974).

Although I believe that our disposition adequately sets the stage for future decisions in this area, I would have preferred a less open-ended resolution of the present controversy. As of now, there is no need for this court to take any action to alter VEPCO's license amendment. The North Anna plant will not need the extra storage space that the amendment authorizes for at least two and a half years. During that time, a variety of events could occur that would alter the balance of equities involved in enjoining the storage of more than 416 spent fuel assemblies at North Anna. I would have preferred, therefore, to defer decision as to the proper remedy until VEPCO needs the extra storage space. At that time, if the NRC were still out of compliance with NEPA, I would strongly consider enjoining additional storage of spent fuel in the North Anna pool.