**ROCK CREEK PACK STATION, INC., et. al. Plaintiffs,**

v.

**Jack BLACKWELL, Regional Forester, Region 5 of the United States Forest Service; et. al. Defendants.**

**Nos. CIV.A. 03–330(RCL), CIV.A. 03–353.**

United States District Court, District of Columbia.

Nov. 10, 2004.

Richard D. Gardner, O'Melveny & Myers LLP, Kevin R. Garden, Saltman & Stevens, P.C., Washington, DC, David Richard Koch, Turner, Green, Afrasiabi & Arledge LLP, Costa Mesa, CA, for Plaintiffs.

Donna S. Fitzgerald, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, for Defendants.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court on the defendants' motion to dismiss and motion for summary judgment, and the plaintiffs' cross-motion for summary judgment. The defendants' move to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure. The defendants and plaintiffs both move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that no genuine issue of material fact exists and therefore they, respectively, are entitled to judgment as a matter of law. The defendants submitted a motion and memorandum in support of their motion, a memorandum in opposition to the plaintiffs' summary judgment motion, and a reply to the plaintiffs' opposition to their motion. The plaintiffs submitted a motion and memorandum in support of their summary judgment motion, a memorandum in opposition to the defendants' motion, and a reply to the defendants' opposition to their summary judgment motion. Upon consideration of the parties' filings, the applicable law, the Federal Rules of Civil Procedure and the facts of this case, the Court previously found that the defendants' motion to dismiss and for summary judgment should be **GRANTED** because the plain-

tiffs lack standing. *Rock Creek Pack Station, Inc., et. al. v. Blackwell, et. al.,* No. 03–330, consolidated with No. 03–353 (D.D.C. Sept. 30, 2004) (order granting defendants' motion to dismiss and for summary judgment). Because the plaintiffs lacked standing, the remaining motions were rendered moot; the Court therefore does not address the issues in the remaining motions of the parties. This memorandum opinion explains the rationale behind the Court's Order.

## I. BACKGROUND

### A. The Parties

The plaintiffs are Rock Creek Pack Station, Inc. and High Sierra Packers' Association—Eastern Unit. Plaintiffs are commonly referred to as pack stations. Specifically, Rock Creek is a commercial enterprise that provides recreational pack services to persons visiting the wilderness areas in question. (Rock Creek Compl. ¶ 13). High Sierra is an association of commercial entities that provide horses, mules and burros to the public for trips into the wilderness areas in question. (High Sierra Compl. ¶ 5).[1]

The defendants are various Government officials and entities. Specifically, the named defendants are Jack Blackwell, Regional Forester, Region 5 of the United States Forest Service; Jeffrey Bailey, Supervisor, Inyo National Forest; James Boynton, Supervisor, Sierra National Forest; Dale Bosworth, Chief, United States Forest Service; the United States Forest Service; Ann Veneman, Secretary of the United States Department of Agriculture; and the United States Department of Agriculture ("defendants").

### B. The Wilderness Areas in Question

The three wilderness areas in question are located in the central and southern Sierra Nevada mountains in eastern California. (Administrative R. Doc. No. 1 ("ARD 1"), Wilderness Management Plan, at 1, Apr. 2001). The John Muir Wilderness Area was created in 1964 by the original Wilderness Act. (*Id.*). In 1984 it was enlarged by 81,000 acres and currently consists of approximately 580,323 acres. (*Id.*). The Ansel Adams Wilderness Area, formerly known as the Minarets Wilderness Area, was created in 1964. (*Id.*). It was enlarged by 119,000 acres in 1984 by the California Wilderness Act and currently consists of approximately 230,000 acres. (*Id.*). The California Wilderness Act established the Dinkey Lakes Wilderness Area as well. (*Id.*). This 30,000 acre area is located entirely within the Sierra National Forest. (ARD 1 at 2).

### C. Wilderness Area Management Plans

The wilderness areas in question are governed by a Land and Resource Management Plan ("LRMP"). A LRMP is a programmatic level forest-wide plan setting overall management direction, standards, and guidelines for a National Forest. (Administrative R. Doc. 18, Revised Draft Environmental Impact Statement ("EIS"), Glossary at 3, Apr. 2000). A National Forest may contain multiple wilderness areas, all of which would be subject to the LRMP established for the National Forest of which they are a part.

The John Muir, Ansel Adams, and Dinkey Lakes Wilderness Areas fall under the jurisdiction of the Sierra LRMP (1991) and the Inyo LRMP (1988). (Administrative R. Doc. 3 ("ARD 3"), Final EIS, Chapter 1 at 2, Mar. 2001). Each LRMP currently

---

**1.** Backcountry Horsemen of California—Kern Sierra Unit originally sued the defendants as well. Backcountry and the defendants entered into a stipulation dismissing Backcountry's suit without prejudice on April 14, 2004.

contains general management direction applicable to all respective wilderness areas within each forest. ( *Id.*). This direction includes multiple use goals and objectives, forest-wide standards and guidelines, management area prescriptions, and monitoring and evaluation requirements. (*Id.*). In 1979, the Forest Service adopted Wilderness Management Plans for the John Muir and Ansel Adams Wilderness Areas. (ARD 1 at 5).

At issue before the Court is the defendant's adoption of a new Wilderness Management Plan for the John Muir, Ansel Adams, and Dinkey Lakes Wilderness Areas in April 2001. The 2001 Wilderness Management Plan amends the LRMPs on both the Sierra and Inyo National Forests to provide more specific, updated and consistent direction for management of the John Muir, Ansel Adams, and Dinkey Lakes Wilderness Areas. (*Id.*). It supercedes the 1979 wilderness plans for the John Muir and Ansel Adams Wilderness Areas. (*Id.*) An explanation of the process leading up to the adoption of the 2001 Wilderness Management Plan follows.

The Inyo and Sierra Forest LRMPs incorporated the John Muir (1979) and Minarets Wilderness Management Plans (1978). (ARD 3, Chapter 1 at 2). The Forest Service proposed to amend the plans to provide for new management direction. In 1997, the Forest Service released an EIS covering the John Muir, Ansel Adams, and Dinkey Lakes Wilderness Areas to analyze various alternatives for managing these wilderness areas. (ARD 3, Summ. at 1). After almost one year of public review and after receiving over 2,000 comment letters, the Forest Service issued a revised EIS. (*Id.*). The Forest Service released the revised draft EIS in August of 2000, and received about 1,700 comment letters. (*Id.*). After reviewing the letters and completing additional field analysis, the Forest Service issued the final EIS in March of 2001. (*Id.*). In April 2001, the Forest Service issued its Record of Decision, (Administrative R. Doc. No. 2 ("ARD 2"), Final EIS, R. of Decision, Apr. 2001), which established the joint 2001 Wilderness Management Plan for the John Muir, Ansel Adams, and Dinkey Lakes Wilderness Areas and includes non-significant amendments to the LRMPs for the Sierra and Inyo National Forests. (ARD 2, R. of Decision at 1).

The Forest Service analyzed five management alternatives and chose an alternative that combines existing management direction with strategies from two alternatives. (ARD 3, Summ. at 5). The selected alternative created three categories of management in the wilderness areas. (*Id.*). Categories 1 and 2 consist of large areas managed for low and moderate use levels, while Category 3 consists of small, confined areas of more concentrated visitor use that coincide with historical areas of high use. (*Id.*).

The Wilderness Management Plan maintains the level of commercial use at the levels that existed before the plan, but reduces uses in certain areas where limiting factors indicate that such action is necessary to alleviate impacts. (*Id.*). The Wilderness Management Plan also attempts to achieve equitable use between commercial and non-commercial users by proposing changes to commercial operations on gaining access to the wilderness. (*Id.*).

The Forest Service explained the reasoning for choosing the preferred alternative in the Record of Decision, which was issued in April 2001. (ARD 2). Following the Forest Service's adoption of the Wilderness Management Plan, the plaintiffs each filed timely administrative appeals pursuant to 36 C.F.R. Part 217 (2000).

(Administrative R. Doc. 6, Rock Creek Notice of Appeal; Administrative R. Doc. 8, High Sierra Notice of Appeal; Administrative R. Doc. 10, Backcountry Notice of Appeal). The Deputy Regional Forester affirmed the decision made in each appeal. (Administrative R. Docs. 7,9,11, Deputy Regional Forester Decisions). The plaintiffs then filed suit in federal district court.

## D. The Suit Before This Court

The plaintiffs assert jurisdiction under numerous federal statutes and make numerous claims against the defendants. In their complaints, the plaintiffs allege that the defendants' new Wilderness Management Plan for the John Muir and Ansel Adams Wilderness Areas violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d, by failing to prepare an EIS that carefully analyzes environmental aspects of proposed alternatives. (Rock Creek Compl. ¶¶ 53–58; *see generally* High Sierra Compl. p. 20). The plaintiffs further allege that the adoption of the Wilderness Management Plan pursuant to its final EIS violates the Wilderness Act, 16 U.S.C. §§ 1131–1136, which created the wilderness areas at issue. (Rock Creek Compl. ¶¶ 59–61; *See generally* High Sierra Compl. p. 20). The plaintiffs also assert this Court has jurisdiction under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et. seq. (Rock Creek Compl. ¶ 10; High Sierra Compl. ¶ 2). Rock Creek asserts that jurisdiction is also conferred under and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, et. seq. (Rock Creek Compl. ¶ 10).[2]

## E. Injunctions Affecting Wilderness Areas at Issue

Management of two of the three wilderness areas involved in this case (John Muir and Ansel Adams) is further affected by an injunction issued by the United States District Court for the Northern District of California. *High Sierra Hikers Ass'n v. Powell*, No. C–00–01239–EDL, 2001 WL 1382176, 2002 U.S. Dist. LEXIS 18087 (N.D.Cal. Nov. 1, 2001), *aff'd, High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886 (9th Cir.2004). The injunction requires the Forest Service to undertake additional NEPA compliance in connection with the issuance of special use permits to packers.

In April 2000 the High Sierra Hikers Association and other non-profit organizations filed suit against defendants under NEPA, NFMA, the Wilderness Act, and the APA. *High Sierra Hikers Assoc'n v. Powell*, 150 F.Supp.2d 1023, 1028–29 (N.D.Cal.2001). The suit was filed about one year before the defendants issued their Record of Decision. On July 24, 2000 the District Court permitted Rock Creek and High Sierra to intervene as to the relief phase of the case, but denied their motions with respect to the merits phase. *Id.* at 1029 n. 1. The Court denied the non-profit organizations' claims under NFMA and the Wilderness Act, finding them moot. *Id.* at 1046. The Court granted the non-profit organizations' motion with respect to the claims under NEPA, finding the Forest Service violated NEPA by failing to assess the environmental impact of issuing multiple-year special use permits to commercial operators in the wilderness. *Id.* at 1043, 1046. The plaintiffs moved for injunctive relief on the

---

2. High Sierra also asserts this Court has jurisdiction pursuant to the California Wilderness Act, Pub.L. 98–425; the Regulatory Flexibility Act, 5 U.S.C. § 601, et. seq., the Forest Rangeland Renewable Resources Act, 16 U.S.C. § 1600, et. seq. (which refers to the same statutory provisions as NFMA), the Americans with Disabilities Act, 42 U.S.C. § 12182, and the Rehabilitation Act, 29 U.S.C. § 794.

NEPA claim, which was granted in January 2002. *High Sierra Hikers Assoc'n v. Powell*, No. C–00–01239–EDL, 2002 WL 240067, 2002 U.S. Dist. LEXIS 2871 (N.D.Cal. Jan. 9, 2002). The Court found plaintiffs had shown evidence of environmental degradation caused by stock use. *Id.*, 2002 WL 240067, *4, 2002 U.S. Dist. LEXIS 2871, at *12. The Court held that the balance of harms and the public interest favored the issuance of an injunction to prevent further harm to the environment. *Id.* at *6, 2002 U.S. Dist. LEXIS 2871, *19.

Under the January 2002 injunction, which remains in effect, the Court required the Forest Service to complete a cumulative impacts analysis of pack station operation by no later than December 31, 2005. *Id.* at **8–9, 2002 U.S. Dist. LEXIS 2871, **24–25. The Court further ordered the Forest Service to complete site specific environmental analysis under NEPA for each permittee by no later than December 31, 2006. *Id.* at **8–9, 2002 U.S. Dist. LEXIS 2871, *25.

The injunction also reduced service days allocated in the Wilderness Management Plan by 20%, allocating a certain amount to the east and west sides of the Sierra Nevada Mountains, and requiring the Forest Service to allocate the service days among the various pack stations in proportion to their use of service days as demonstrated in certain identified portions of the final EIS. *Id.* at **8–9, 2002 U.S. Dist. LEXIS 2871, **25–26.

Until completion of the NEPA process, the District Court also enjoined the use of the pool of 3,000 extra service days that had been established in the Wilderness Management Plan. *Powell*, 2002 WL 240067, **8–9, 2002 U.S. Dist. LEXIS 2871, at *26. The Court further limited the maximum group size for overnight trips supported by commercial packstock at 12 people and 20 stock. *Id.* Where the Wilderness Management Plan proposed to phase in trailhead quotas over a five-year period, the Court required the trailhead quotas to be phased in over a two-year period. *Id.*, 2002 WL 240067, *9, 2002 U.S. Dist. LEXIS 2871, at *27. For the first year, beginning in 2002, the trailhead quotas were not to exceed 130% of the quotas listed in the Wilderness Management Plan. *Id.* In 2003, the quotas were not to exceed 115% of the quotas in the plan, and in 2004 and thereafter the quotas were not to exceed 100% of the quotas in the plan. *Id.*

The District Court also ordered the Forest Service to use interim criteria to approve or disapprove non-system trail use by commercial operators, and the Court required all Forest Orders listed in the Record of Decision, such as orders restricting fires at certain elevations or closing certain meadows to grazing, to be implemented by June 1, 2002. *Id.* In the period before the Forest Service completed the required NEPA analyses and issues special use permits, commercial packstock operations cannot occur except under the terms and conditions of the Court's order, or under any Forest Service plans, permits, or directives that are consistent with the order. *Powell*, 2002 WL 240067, **9–10, 2002 U.S. Dist. LEXIS 2871, at *27–28.

## II. APPLICABLE LAW

### A. NEPA

■ NEPA has twin aims. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). First, it requires federal agencies to examine environmental impacts of proposed federal actions. *Id.* Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process. *Id.*

■ Although those procedures are almost certain to affect an agency's substantive decision, it is well settled that NEPA does not require a particular agency to reach a particular result based on the information it collects and analyzes, but only prescribes the necessary process. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citation omitted). NEPA provides a set of action-forcing procedures that require that agencies take a hard look at environmental consequences and that provide for broad dissemination of relevant environmental information. *Id.*

NEPA requires agencies to prepare EISs on all proposals for major federal actions that will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

## B. NFMA

NFMA provides that the "Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System . . . ." 16 U.S.C. § 1604(a). Further, "[t]he Secretary shall provide for public participation in the development, review, and revision of land management plans . . . ." 16 U.S.C. § 1604(d). Such plans or revisions are to be made available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption during which time the Secretary shall hold public meetings. *Id.* In developing, maintaining, and revising plans for units of the National Forest System, the Secretary shall assure that such plans provide for multiple use and sustained yield in accordance with the Multiple Use Sustained Yield Act of 1960. 16 U.S.C. § 1604(e).

## C. The Wilderness Act

Congress established the wilderness preservation system in 1964 with the enactment of the Wilderness Act, 16 U.S.C. §§ 1131–1136. The Wilderness Act provides Congress with the ability to designate certain areas as "wilderness," and the United States government to administer those lands for the use of and enjoyment by the American people, and in a manner that leaves the lands "unimpaired" for future use and enjoyment. 16 U.S.C. § 1131(a). "Wilderness" is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. . . . [It is an area of] undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, and which is protected and managed as to preserve its natural conditions . . . ." 16 U.S.C. § 1131(c). Any human impact is to be "substantially unnoticeable". *Id.*

The purposes of the Wilderness Act are within and supplemental to the purposes for which national forests are established and administered. 16 U.S.C. § 1133(a). Except as otherwise provided by statute, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area, and shall administer the area for such other purposes for which it may have been established in such away also to preserve its wilderness character. 16 U.S.C. § 1133(b). Except as otherwise provided, wilderness areas must be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historic use. *Id.* Except as specifically provided in the act, and subject to existing private rights, commercial enterprises are prohibited in the wilderness areas. 16 U.S.C. §§ 1133(c), 1133(d)(5). Section 1133(d)(5) states: "[c]ommercial services may be performed within the wilderness areas . . . to the extent necessary for activ-

ities which are proper for realizing the recreational or other wilderness purposes of the areas."

## III. ANALYSIS

### A. Standard of Review

■ The plaintiffs filed this case pursuant to the APA. 5 U.S.C. § 701; (Rock Creek Compl. ¶ 10; High Sierra Compl. ¶ 2). The task of a reviewing court, therefore, is to apply the APA standard of review to the agency decision based on the record the agency presents to the reviewing court. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (citations omitted). The APA standard of review requires a court to determine if agency action is arbitrary, capricious, an abuse of discretion, without observance of the procedure required by law, or otherwise not in accordance with the law. 5 U.S.C. § 706. This standard is applied to review compliance with NEPA to determine the adequacy of an EIS. *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C.Cir.2002). This "'standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" *San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C.Cir.1986) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). When reviewing an EIS, it does not matter whether a court agrees with the agency's conclusions. *City of Olmsted Falls, Ohio*, 292 F.3d at 273. The EIS, rather, acts only as a procedural safeguard. *Id.*

■ The scope of review is limited to the administrative record that was before the agency at the time it made its decision. *Lorion*, 470 U.S. at 743, 105 S.Ct. 1598. The plaintiffs have the burden of showing that the defendants acted in a manner contrary to the APA. *San Luis Obispo Mothers for Peace*, 789 F.2d at 37.

### B. Motion for Summary Judgment

Because the case at bar comes to the Court on cross-motions for summary judgment, the Court will assess the record under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Each party argues that no genuine issue of material fact exists, thus, summary judgment should be granted in their respective favor. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment may be granted if evidence favoring the non-moving party is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Once the moving party files a proper summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56.

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If no such showing is made, the moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Id.* at 323, 106 S.Ct. 2548.

### C. Standing

In order to invoke the jurisdiction of the federal courts, a plaintiff must demonstrate that a case or controversy exists between themselves and defendants within the meaning of Article III of the United States Constitution. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A core component of the case or controversy inquiry is the doctrine of standing. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The question of "standing" determines whether a litigant is entitled to have a court decide the merits of a dispute or of particular issues. *Id.* To establish standing, plaintiffs bear the burden of demonstrating that: (1) they suffered an "injury in fact", which is an invasion of a legally protected interest that is concrete and particularized and "actual or imminent", not conjectural or hypothetical; and (2) the there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Since the plaintiffs have challenged the defendants' compliance with NEPA under the APA, 5 U.S.C. § 551, the plaintiffs must also demonstrate that the injuries they allegedly suffered fall within the "zone of interests" that NEPA protects. *Lujan,* 497 U.S. at 883, 110 S.Ct. 3177. Recreational use and aesthetic enjoyment are considered among the sorts of interests NEPA was specifically designed to protect. *Id.* at 886, 110 S.Ct. 3177. An allegation of injury to monetary interest alone may not bring a party within the zone of environmental interests as contemplated by NEPA. *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir.1977). But a party is not precluded from asserting cognizable injury to environmental values because its "real" or "obvious" interest may be viewed as monetary in nature. *Id.* (citation omitted). It is established in this circuit that a party is not disqualified from asserting a legal claim under NEPA because the impetus behind the NEPA claim may be economic. *Id.* at 452–53.

A plaintiff may have standing to challenge the failure of an agency to abide by procedural requirements only if the requirements are designed to protect some threatened concrete interest of the plaintiff. *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996). In that type of case, which includes suits demanding preparation of an EIS, a plaintiff must show the government action performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff. *Id.* The mere violation of a procedural requirement does not permit any person to sue the Government. *Id.*

The Court first addresses the defendants' motion to dismiss and for summary

judgment. If the defendants are correct as to the plaintiffs' lacking standing to bring their claim; the defendants' motion to dismiss and for summary judgment will be granted as a matter of law and discussion of plaintiffs' cross-motion for summary judgment will be deemed moot.

In their various pleadings the plaintiffs assert three types of injuries. First, the plaintiffs cite injuries related to the environment itself. (*See generally* Rock Creek Compl. ¶¶ 56, 61; *See* High Sierra Compl. ¶¶ 13, 41, 43, 45–46). Second, the plaintiffs allege they suffered economic injuries. (Pls.' Opp'n to Defs.' Mot. to Dis. and for Summ. J. at 5; Pls.' Reply in Supp. of Mot. for Summ. J. at 2). Finally, the plaintiffs allege they suffered injuries related to their recreational use and aesthetic enjoyment of the environment. (Pl.'s Opp'n to Def.'s Mot. Dismiss and Mot. for Summ. J., Craig London Aff.). The Court will review each of these three alleged injuries separately.[3]

### 1. Economic Injuries

■■ The plaintiffs summarized their alleged economic injuries in multiple filings. The plaintiffs alleged in their complaint and their motion for summary judgment that the defendants' adoption of the new Management Plan has substantially harmed them by limiting their trail access, slashing their service days, and banning their use of campfires in numerous areas of the wilderness. (Pls.' Opp'n to Defs.' Mot. to Dis. and for Summ. J. at 5; Pls.' Reply in Supp. of Mot. for Summ. J. at 2).

The plaintiffs and defendants each provided the Court with persuasive arguments concerning standing in this regard. The defendants correctly argued that an allegation of injury to monetary interest alone may not bring a party within the zone of environmental interests as contemplated by NEPA. *Eckerd,* 564 F.2d at 452. The plaintiffs correctly argued that a party is not precluded from asserting cognizable injury to environmental values because its "real" or "obvious" interest may be viewed as monetary in nature. *Id.* (citation omitted).[4] In other words, it is established in this circuit that a party is not disqualified from asserting a legal claim under NEPA because the impetus behind the NEPA claim may be economic. *Id.* at 452–53. Further, the plaintiffs are correct that a court has granted standing when a party asserts economic injury interrelated with environmental concerns. *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115 (8th Cir.1999).

The Court need not parse through the nuances of the standing doctrine in this regard, however, because plaintiffs' accompanying affidavit and declaration in response to the defendants' motion for summary judgment neither alleges nor establishes any economic injury to the plaintiffs. Since the matter before the Court is at the summary judgment stage, the plaintiffs' response to the defendants' motion for summary judgment, must by affidavits or otherwise, set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56. The plaintiffs apparently attempt to jump this hurdle in their reply to the defendants' motion for

---

**3.** Rock Creek and High Sierra filed separate complaints. All of their motion filings were not separate including their opposition to the defendants' motion for summary judgment. Instead, Rock Creek and High Sierra filed joint pleadings, which referred to Rock Creek's alleged injuries only.

**4.** Both parties cited cases other than the *Eckerd* case for the propositions which the Court refers to in the text preceding this footnote.

summary judgment through an affidavit from Craig London, the current operator and proprietor of Rock Creek. (Pls.' Opp'n to Defs.' Mot. to Dismiss and for Summ. J. at ¶ 1).[5] In the seven paragraph affidavit London does not assert Rock Creek has suffered any specific economic injuries; nor does he tie any economic injuries to any alleged environmental damage. In paragraph one London states his family has operated Rock Creek since 1947 and that he has assisted with daily activities at Rock Creek since 1959, when he was five years old. (*Id.* at ¶ 1). In paragraph two London states: "Rock Creek provides me with financial support" and that he leads "paid trips" into the wilderness. (*Id.* at ¶ 2). He does not allege in paragraph two, let alone establish as fact, that he lost any financial support due to the defendants' actions, nor does he allege or establish as fact that Rock Creek's number of paid trips has diminished because of defendants' actions. In paragraph three London indicates he: "used to take groups through the Hopkins Trail", a trail he previously used, which "is now off limits for pack stock". (*Id.* at ¶ 3). London, however, does not indicate that this restriction harmed Rock Creek economically. In paragraph four London indicates a campfire is critical to staying warm around Pioneer Lake No. 2 during cold temperatures. (*Id.* at ¶ 4). In paragraph five London explains that: "clients also believe a campfire is a basic part of a packing/camping trip, so if we cannot make a campfire, clients will not want to go to such a destination. Under the new [p]lan, though, I cannot build a campfire at Pioneer Lake No. 2 because it is above the arbitrary campfire elevational cutoff, and the lake is now unusable for most of the year." (*Id.* at ¶ 5). London here only

presents a belief that clients will not want to go to a destination without a campfire. He does not present a specific fact showing that Rock Creek actually lost any business because of the new campfire policy. In paragraph six London states that: "[t]here are several sites in the Tamarack [area of the wilderness] that are of significance in ... [his] family's history" and he "would take clients and friends to these areas and share stories with them ...." (Pls.' Opp'n to Defs.' Mot. to Dismiss and for Summ. J. at ¶ 6). Regarding any economic consequence in relation to this assertion, London only indicates he: "cannot take packstock on many trails that I had historically used ...." (*Id.* at ¶ 6). London does not establish any specific fact showing the inability to take packstock into these trails caused economic damage to Rock Creek. In paragraph seven London only discusses the impact of defendants' regulation on his "personal enjoyment of the wilderness"; thus, he does not establish any factual disputes concerning economic or interrelated environmental injuries. (*Id.* at ¶ 7). Since London's affidavit (and verbatim declaration) do not assert or establish any economic injury to Rock Creek, plaintiffs have not established an injury in fact based on alleged economic damage to Rock Creek.

### 2. Environmental Injuries

■ London's affidavit and verbatim declaration do not assert or allege any environmental damage to the wilderness areas in question. As the foregoing explanation of the affidavit shows, London does not refer to any alleged environmental damages to the wilderness areas in question. Consequently, plaintiffs have not es-

---

**5.** Craig London's declaration of March 19, 2004 follows his affidavit verbatim. (Pls.' Re-

ply in Supp. of Mot. for Summ. J. at 14–15).

tablished an injury in fact based on environmental damage to the wilderness areas in question at the summary judgment stage of this litigation.

### 3. Recreational Use and Aesthetic Enjoyment of the Wilderness Areas

■ Finally, the plaintiffs cannot establish they suffered an injury in fact under a theory that their recreational use and aesthetic enjoyment of the wilderness areas in question were detrimentally affected by the defendants' actions. It is true that recreational use and aesthetic enjoyment are the sorts of interests within the zone of interest of NEPA. *Lujan,* 497 U.S. at 885, 110 S.Ct. 3177; *see also Friends of the Earth, Inc. v. Laidlaw Environmental Serv., Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan,* 504 U.S. at 562–63, 112 S.Ct. 2130; *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The plaintiffs, however, admit that the current proprietors of Rock Creek, Herb and Craig London, "certainly operate Rock Creek as a commercial venture . . . ." (Pl.'s Opp'n to Def.'s Mot. Dismiss and Mot. for Summ. J. at 5). Further, the plaintiffs described High Sierra as "an association of commercial entities . . . which provide horses, mules and burros ('stock') to the public for trips" into various wilderness areas. (High Sierra Compl. ¶ 5). High Sierra stated that: "[t]he continued viability of their commercial operations depends on the Wilderness Areas maintaining their primitive and historical character." (*Id.* at ¶ 10). The plaintiffs do not provide, nor can this Court find, authority for the proposition that a commercial entity itself can enjoy the recreational use and aesthetic enjoyment of the environment. Consequently, such a commercial entity cannot establish standing under a recreational use

and aesthetic enjoyment of the environment rationale.

■ Craig London's affidavit and declaration only establish that London individually will lose the recreational use and aesthetic enjoyment of the environment. London states in his affidavit that he chose to operate Rock Creek because he enjoys the wilderness and he receives great pleasure leading pack trips into the wilderness. (Pl.'s Opp'n to Def.'s Mot. Dismiss and Mot. for Summ. J., Craig London Affidavit, ¶ 2). London frequently travels into the wilderness on his own personal time. (*Id.*). London indicated that his inability to access Hopkins Pass Trail meant he could not access it on business or personal time. (*Id.* at ¶ 3). London claims that under the new Wilderness Management Plan he no longer has the same degree of freedom and enjoyment to travel to areas that he has visited before the new plan was implemented. (*Id.* at ¶ 3). Similarly, London claims the restrictions on campfires interferes with his enjoyment of the land because campfires increase his personal enjoyment of the camping experience. (*Id.* at ¶ 4). Because certain areas of the Tamarack Area of the wilderness can no longer be accessed under the Wilderness Management Plan, London claims he has lost the personal enjoyment of taking trips using certain trails in that area. Finally, London states that the decision to permit unregulated growth in day use of the wilderness areas under the new plan impacted his personal enjoyment of the wilderness. (*Id.* at ¶ 7). London said the wilderness loses the qualities that makes it enjoyable to him when trails and campsites are busier due to the new regulations on use. (Pl.'s Opp'n to Def.'s Mot. Dismiss and Mot. for Summ. J., Craig London Affidavit, ¶ 7). The unregulated day use therefore has reduced his enjoyment of traveling into wilderness areas. (*Id.*).

■ Craig London's recreational use and aesthetic enjoyment of the wilderness areas in question is not an issue before the Court. London, individually, is not a party and has not asserted a claim against the defendants in the matter before the Court. Only Rock Creek and High Sierra, which the plaintiffs admit are both operated as commercial ventures, asserted a claim against the defendants. This distinction is critical because "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.'" *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (quoting *Sierra Club*, 405 U.S. at 734, 92 S.Ct. 1361). The parties seeking review here, Rock Creek and High Sierra, cannot establish that they were injured under a recreational use or aesthetic enjoyment of the environment rationale. Craig London, individually, is not a party seeking review here, thus, whether he personally suffered an injury or not is irrelevant to determining whether Rock Creek and/or High Sierra suffered an injury in fact.[6]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs lack standing to bring their claims. As such, the defendants' motion to dismiss and for summary judgment was **GRANTED**. The plaintiffs' cross-motion for summary judgment was therefore **DENIED**.

---

[6]. The defendants also argue that the plaintiffs lack standing under the Americans with Disabilities Act and the Rehabilitation Act. The plaintiffs did not address this argument in their reply to the defendant's motion to dismiss and for summary judgment. Because the plaintiffs only addressed the standing issue pursuant to the arguments discussed in this opinion, plaintiffs have not established standing under any other federal statute.