(Slip Opinion)

# Committee Resolutions Under 40 U.S.C. § 3307(a) and the Availability of Enacted Appropriations

Under 40 U.SC. § 3307(a), committee approval resolutions do not establish binding limits on how the General Services Administration may expend appropriated funds. If Congress appropriates funds for a project that has not received committee approval, section 3307(a) does not constrain what the Executive Branch may do with the funds.

Committee resolutions adopted under section 3307(a) have no effect on the availability of appropriated funds for purposes of the Anti-Deficiency Act.

January 26, 2018

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

Under 40 U.S.C. § 3307(a), an appropriation to construct, alter, acquire, or lease certain buildings "may be made only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made." An adjoining provision directs the Administrator of General Services to "transmit to Congress a prospectus of the proposed facility" in order to "secure consideration for the approval referred to in subsection (a)." *Id*. § 3307(b).

Your office has asked whether committee resolutions adopted under section 3307(a) create conditions on the availability of enacted appropriations that bind the Executive Branch. *See* Letter for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Kris E. Durmer, General Counsel, General Services Administration (May 13, 2016) ("GSA Letter").[1] This request follows a decision of the

---

[1] We have also solicited and considered the views of other agencies. *See* Memorandum for Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Douglas K. Mickle, Assistant Director, Civil Division, National Courts Section, *Re: Prospective Application of 40 U.S.C. § 3307 by the General Services Administration in Light of* Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163 (2015)* (June 29, 2016); E-mail for Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather Walsh, Deputy General Counsel, Office of Management and Budget, *Re: GSA Request for Opinion* (June 24, 2016 1:13 PM); E-mail for Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Richard Hipolit, Deputy General Counsel, Department of Veterans Affairs, *Re: GSA Request for Opinion* (Aug. 5, 2016 3:57 PM).

Court of Federal Claims, *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163 (2015), which set aside a General Services Administration ("GSA") lease on precisely that ground, *id.* at 185–90, contravening the Executive Branch's longstanding interpretation of section 3307 and its previous incarnations.

Having reviewed the matter again in light of *Springfield Parcel*, we reiterate this Office's established position and conclude that section 3307(a) does not impose independent limitations on the use of enacted appropriations. By its plain terms, section 3307(a) sets an internal rule of congressional procedure that no appropriations "may be made" for certain projects unless preceded by resolutions of approval from the relevant committees. Section 3307(a) does not purport to make those committee resolutions binding upon the actions of the Executive Branch. Thus, if Congress disregards section 3307(a) and appropriates funds for projects that have not received committee approval, then section 3307(a) does not constrain what the Executive Branch may do with the appropriated funds.

## I.

GSA "may enter into a lease agreement . . . for the accommodation of a federal agency in a building (or improvement) which is in existence or being erected by the lessor to accommodate the federal agency." 40 U.S.C. § 585(a)(1). In fact, GSA has the "sole authority" to enter into such leases for many federal agencies. *Authority of Military Exchanges to Lease General Purpose Office Space*, 21 Op. O.L.C. 123, 124 (1997); *see also, e.g.*, 3 General Accounting Office, *Principles of Federal Appropriations Law* 13-135 to -136 (3d ed. 2008) ("*Federal Appropriations Law*") (noting that GSA "serves as the government's chief 'leasing agent'"). GSA finances its leasing operations and other real-estate activities through the Federal Buildings Fund established by 40 U.S.C. § 592. GSA Letter at 9. Money in the fund is "available for real property management and related activities in the amounts specified in annual appropriation laws." 40 U.S.C. § 592(c)(1). In 2015, for example, Congress appropriated more than $10 billion to the fund, "of which . . . $5,579,055,000" was appropriated "for rental of space to remain available until expended." Financial Services and General Government Appropriations Act, 2016, Pub. L. No. 114-113, div. E, tit. V, 129 Stat. 2242, 2423, 2451–53 (2015).

The statute at issue provides that "appropriations may be made" for certain substantial real-estate projects "only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made." 40 U.S.C. § 3307(a). The covered projects include those that require appropriations "to lease any space at an average annual rental in excess of $1,500,000 for use for public purposes," *id.* § 3307(a)(2), or appropriations to "construct, alter, or acquire any building to be used as a public building which involve[] a total expenditure in excess of $1,500,000," *id.* § 3307(a)(1).[2]

The statute also establishes a process by which the committees are to review and grant their approval for potential appropriations. Under section 3307(b), the Administrator of General Services must send Congress a prospectus to secure the committees' consideration of the approval referred to in subsection (a). The prospectus must contain various details about the project, including a "brief description of the building" and "an estimate of the maximum cost to the Government of the facility to be constructed, altered, acquired, or the space to be leased." *Id.* § 3307(b)(1), (2). Section 3307(c) provides that "[t]he estimated maximum cost of any project approved under this section . . . may be increased by an amount equal to any percentage increase, as determined by the Administrator, in construction or alteration costs from the date the prospectus is transmitted to Congress," but "[t]he increase . . . may not exceed 10 percent of the estimated maximum cost." Finally, section 3307(d) provides that "[i]f an appropriation is not made within one year" of the committees' approval of a prospectus for the project, either committee "may rescind its approval before an appropriation is made."

The project at issue in *Springfield Parcel* illustrates the typical operation of section 3307. In January 2014, GSA submitted a prospectus to the congressional committees for a "lease of up to 625,000 rentable square feet" of office space for the Transportation Security Administration ("TSA"), with an estimated annual cost of more than $24 million. GSA

---

[2] GSA may adjust the dollar figures in section 3307 to account for changes in construction costs. 40 U.S.C. § 3307(h). The Fiscal Year 2018 prospectus threshold for construction, alteration, and leasing projects is $3.095 million. *See* 41 C.F.R. § 102-73.35; *GSA Annual Prospectus Thresholds*, http://www.gsa.gov/annualprospectusthreshold (last visited Jan. 26, 2018).

Letter, Ex. 2. The three-page prospectus described additional details of the proposed project and explained its purpose—chiefly, consolidating TSA's offices from five buildings into one. In February 2014, the House Committee on Transportation and Infrastructure resolved, "pursuant to 40 U.S.C. § 3307," that "appropriations are authorized for a replacement lease of up to 625,000 rentable square feet," as described in the prospectus. GSA Letter, Ex. 3. In April 2014, the Senate Committee on Environment and Public Works similarly resolved, "pursuant to title 40 U.S.C. § 3307," that the "prospectus . . . is approved." GSA Letter, Ex. 4. Each resolution recited some details of the proposed project, including the 625,000-square-foot cap, and described the prospectus as either "included in" (Ex. 3) or "made part of" (Ex. 4) the resolution. Congress did not appropriate any funds on a line-item basis for the project, but it did later appropriate lump-sum funds to the Federal Buildings Fund for leasing activities. *See, e.g.*, Financial Services and General Government Appropriations Act, 2015, Pub. L. No. 113-235, div. E, tit. V, 128 Stat. 2130, 2332, 2360 (2014). Congress never adopted or approved the prospectus itself in legislation.

In September 2015, after GSA awarded a lease for the TSA project, an unsuccessful offeror challenged the award in the Court of Federal Claims. GSA Letter at 1–2. Among other things, the plaintiff alleged that GSA had "violated the Public Buildings Act, specifically 40 U.S.C. § 3307(a)," by awarding a lease for more than 625,000 rentable square feet of office space, "because Congress authorized appropriations only for a building with a maximum of 625,000 rentable square feet." *Springfield Parcel*, 124 Fed. Cl. at 182. The court agreed, holding that committee resolutions under section 3307(a) "create[] binding conditions upon the availability of appropriations" and that "[a]ppropriations for TSA headquarters were accordingly available only for a lease of up to 625,000 square feet because that was the limit included in the resolutions adopted by the relevant congressional committees." *Id*. at 189. The court also held that, "[b]ecause no appropriation ha[d] been made for a space exceeding 625,000 rentable square feet," *id*., GSA had violated the Anti-Deficiency Act, 31 U.S.C. § 1341, in awarding the TSA lease. The government declined to appeal the decision, and GSA complied with the judgment, despite continuing to disagree with its reasoning. GSA Letter at 1, 3 n.4, 11. GSA later requested our views concerning the effect of committee

resolutions adopted under section 3307 and their implications for the Anti-Deficiency Act, in light of *Springfield Parcel*.

## II.

### A.

We first consider whether the committee approvals under section 3307(a) establish binding limits on how GSA may expend appropriated funds. In answering that question, "we begin by analyzing the statutory language." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).

Section 3307(a) states that "appropriations may be made" for prospectus-level projects only after the relevant committees "adopt resolutions approving the purpose for which the appropriation is made." Under the Constitution, appropriations must be "made by Law," art. I, § 9, cl. 7, which means they must be made by Congress. Here, section 3307(a) makes committee approval a prerequisite to the enactment of an appropriation, but it does not regulate the actions of the Executive Branch or anyone else. Nothing in the text of section 3307(a) limits GSA's use of funds once "appropriations [have been] made." Thus, contrary to the conclusion of the Court of Federal Claims in *Springfield Parcel*, the "plain text" of section 3307(a) does not make committee approval a "precondition to availability of appropriations," 124 Fed. Cl. at 186. Rather, the plain text makes committee approval a condition only on whether "appropriations may be made" by Congress itself in the future. *Cf. Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264, 277 n.13 (2017) ("[T]he prohibition contained in § 3307 affects whether Congress will appropriate funds for the lease at issue, and not GSA's authority to solicit proposals for a lease."). As we explain below, because Congress may decline to follow such internal directives, committee approval is not, in fact, an invariable precondition to the availability of appropriations.[3]

---

[3] We are aware of no other judicial authority, apart from *Springfield Parcel*, that bears directly on the question presented here. In *Realty Income Trust v. Eckerd*, 564 F.2d 447 (D.C. Cir. 1977), the court of appeals stated that "[u]nder the Public Buildings Act of 1959" GSA "is required to obtain Congressional approval before entering into major leaseholds." *Id*. at 449. But that case did not address the effect of committee approval; instead, the question before the court was whether the National Environmental Policy Act

As Assistant Attorney General William Rehnquist explained in an opinion of our Office discussing a similar 1954 law, a statute addressing when Congress may make appropriations "is, by its terms, not a restriction on the Executive, but rather a directive to Congress itself that there shall be a condition precedent for the enactment of appropriation legislation for a particular project or group of projects." *Constitutionality of "No Appropriation" Clause in the Watershed Protection and Flood Prevention Act*, 1 Op. O.L.C. Supp. 296, 299 (Feb. 27, 1969) ("Rehnquist Memorandum"). "Sponsors . . . have stated that such a requirement could, if desired, be enforced by a point of order in any floor debate of an appropriation bill containing funds for projects which have not been so approved by committee resolution." *Id*. Requiring committee preapproval, on threat of a point of order, may give particular committees—such as the two specified in section 3307(a)—a degree of control over appropriations, which are otherwise principally the domain of the appropriations committees. But such a limitation on making appropriations "confines its operative effect to the Legislative Branch" and "by its terms does not seek to reach out beyond the legislative preserve." *Id*. at 300.

The Rehnquist Memorandum addressed a statute providing that "'[n]o appropriation shall be made'" absent committee approval. *Id*. at 296 (quoting Watershed Protection and Flood Prevention Act, Pub. L. No. 83-566, § 2, 68 Stat. 666, 666 (1954)). But the opinion's reasoning also applies to section 3307(a), which originated as section 7(a) of the Public Buildings Act of 1959 and was phrased in the same terms. *See* Public Buildings Act of 1959, Pub. L. No. 86-249, § 7(a), 73 Stat. 479, 480 ("no appropriation shall be made" for certain construction projects "if such construction . . . has not been approved by resolutions adopted by the

---

required GSA to submit an environmental impact statement when submitting a prospectus. *See id*. at 449, 453. In *210 Earll, LLC v. United States*, 77 Fed. Cl. 710 (2006), the court observed that section 3307(a) did "not operate as a bar to [GSA's] award" of a lease above the prospectus threshold even though GSA had not submitted a prospectus (because the project had been expected to fall below the threshold), but that the statute would require GSA to "take the extra step . . . of obtaining Prospectus approval" before executing the lease. *Id*. at 718. The court was addressing the plaintiff's status as an eligible bidder, not the effect of prospectus approval on the availability of enacted appropriations. In any event, for the reasons discussed in the text, we do not believe that section 3307 itself makes committee approval a prerequisite to the availability of appropriations for any GSA leasing projects.

Committee on Public Works of the Senate and House of Representatives")) (codified at 40 U.S.C. § 606(a) (1964)). Indeed, Rehnquist himself later found his reasoning "equally applicable" to the "Public Buildings Act of 1959, 40 U.S.C. 606(a)." Memorandum for Egil Krogh, Staff Assistant to the Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Encroachment Problem in "No Appropriation" Provisions* at 1 (June 11, 1969).

In 2002, in the course of enacting title 40 into positive law, Congress created section 3307(a) by making minor stylistic changes to former section 606(a), including replacing the "no appropriation shall be made" formulation with the current statement that "appropriations may be made only if" the two committees have adopted resolutions. Pub. L. No. 107-217, sec. 1, § 3307(a), 116 Stat. 1062, 1161 (2002). In doing so, Congress specified that the new version "makes no substantive change in existing law and may not be construed as making a substantive change in existing law." *Id*. sec. 5(b)(1), 116 Stat. at 1303; *see, e.g.*, *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1429 (2014) (relying on similar disclaimer of substantive change in recodification of title 49). The phrasing of section 3307(a) is therefore substantively indistinguishable from the kind of "no appropriation" clause that we have long understood as "bind[ing] only the Congress and not the Executive." Rehnquist Memorandum, 1 Op. O.L.C. Supp. at 301. It still means that committee approval should be understood as a condition applicable only to Congress's appropriation decision, and not to GSA's use of appropriated funds.

Similarly, section 3307(a) does not make binding on GSA any specific term or condition that the committees may recite in approving a prospectus, such as the 625,000-square-foot parameter for the TSA project. In fact, the committee resolutions do not always recite identical terms. *See* GSA Letter at 7. On the TSA headquarters project, for example, each committee resolution contained provisos that were not found in the other committee's resolution. *Compare* GSA Letter, Ex. 3 (House committee approval resolution, providing that GSA and tenant agencies "agree to apply an overall utilization rate of 153 square feet or less per person"), *with* GSA Letter, Ex. 4 (Senate committee approval resolution without any such proviso, but providing that GSA "shall require that the procurement include requirements requiring energy efficiency as would be required for the construction of a federal building," to the "maximum extent practicable"). If the committee resolutions were understood to set binding

conditions, then there could well be circumstances in which they would conflict.

To the extent that it sheds light on the question, the legislative history of the Public Buildings Act is consistent with our view that section 3307(a) limits only the legislative process for making appropriations. In a hearing, one Senator asked GSA officials to address a professor's criticism that the "no appropriations" language gave the committees a legislative veto. *Hearing on S. 1654 and H.R. 7645 before a Subcomm. of the S. Comm. on Public Works*, 86th Cong. 19–21 (1959) (statement of Sen. Neuberger). GSA had assisted in drafting the legislation, and its general counsel explained that the committee-approval mechanism was "not strictly a legislative veto" because "it is committee approval for the making of appropriations." *Id.* at 21 (statement of Mr. Macomber). He later elaborated:

> And the way that leaves it is that if a prospectus, a project, is approved by the two committees, then an appropriation can be made, and it is in the appropriation process that the consideration of the Congress will occur. On the other hand, of course, there would be nothing to prevent the inclusion in an appropriations bill of a project that was not approved by the two committees, except that in that event, such language would be subject to a point of order.

*Id.* at 23. The committee reports also suggest that legislators understood that section 7(a) of the Public Buildings Act would operate as merely an internal limit on making appropriations. *See* H.R. Rep. No. 86-557, at 9 (1959) (section 7 "generally prohibits an appropriation" absent committee approval); S. Rep. No. 86-694, at 6 (1959) (same).[4]

The Executive Branch has long adhered to this interpretation of "no appropriation" clauses, including in section 7(a) of the Public Buildings Act. Before the Rehnquist Memorandum, the Johnson Administration did object on constitutional grounds to several "no appropriation" clauses, treating them as the equivalent of a legislative veto. *See, e.g.*, Statement by the President Upon Signing the Water Resources Research Act (July 17, 1964), 2 *Pub. Papers of Pres. Lyndon B. Johnson* 861, 862 (1963–64);

---

[4] The Senate committee report concerned a parallel bill that contained the same "no appropriation" clause. *See* S. 1654, 86th Cong. § 7(a) (as reported by S. Comm. on Pub. Works, Aug. 13, 1959).

*see also* Rehnquist Memorandum, 1 Op. O.L.C. Supp. at 299–300 (discussing Johnson Administration objections). The Rehnquist Memorandum, however, addressed that concern, and since then, the Executive Branch has generally seen "no appropriation" clauses as consistent with the separation of powers because they operate only as internal restraints on Congress's appropriations processes. In 1972, when Congress amended section 7(a) to cover leases for the first time, President Nixon's signing statement memorialized, and "acquiesced in," the understanding that "Congress regards th[e] 'no appropriation may be made' provision as internal Congressional rulemaking which does not affect the executive branch." Statement About Signing the Public Buildings Amendments of 1972 (June 17, 1972), *Pub. Papers of Pres. Richard M. Nixon* 686, 687 (1972); *see also* Public Buildings Amendments of 1972, Pub. L. No. 92-313, sec. 2(4), § 7(a), 86 Stat. 216, 217 (amending section 7 to cover certain leases). In the intervening decades, the Department of Justice has repeatedly expressed the same view.[5]

---

[5] *See, e.g.*, Letter for James T. McIntyre, Jr., Acting Director, Office of Management and Budget, from Patricia M. Wald, Assistant Attorney General, Office of Legislative Affairs, at 1 (Nov. 25, 1977) ("It is our view . . . that statutes such as [40 U.S.C.] § 606 . . . operate only as internal rules of Congress that may be overridden by a subsequent appropriation bill disregarding their plain language."); Memorandum for Nicholas P. Wise, Deputy Assistant Attorney General, Office of Legislative Affairs, from David G. Leitch, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Judicial Space and Facilities Management Act of 1991, S. 2070*, att. at 1 (Mar. 4, 1992) ("[W]e have long interpreted the 'no appropriation' provision in the Public Buildings Act, 40 U.S.C. § 606(a), to be, in effect, an internal regulation by which Congress has established the committee review procedure for handling the appropriations legislation necessary to fund the particular building project described in the prospectus."); Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Randolph Moss, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 1005*, at 1 (May 30, 1996) ("As it currently stands, . . . § 606 is an internal procedural rule governing Congress's deliberation with respect to appropriations for the covered categories of public buildings projects."); Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Sheldon Bradshaw, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: General Services Administration Draft Bill to Raise Certain Prospectus Submission Thresholds in the Public Buildings Act of 1959*, at 3 (Feb. 20, 2002) ("[W]e have viewed the current version of 40 U.S.C. § 606 . . . as an internal procedural rule governing Congress's deliberation with respect to appropriations for the covered categories of public building projects."). On a few recent occasions, in the context of commenting on proposed legislation, we have characterized section 3307 as an unconstitutional legislative veto. We have reviewed these aberrant comments and, on

During that period, Congress amended section 7 of the Public Buildings Act on several occasions, both before and after the 2002 codification of title 40 discussed above.[6] But, so far as we are aware, Congress has never disagreed with the Executive Branch's construction of the "no appropriation" clause. To the contrary, in 1980, the chairman of the pertinent Senate committee, joined by other committee members of both parties, acknowledged GSA's legal conclusion that the committee-approval requirement "does no more than establish a rule internal to the Congress" and that "action by th[e] Committee need not precede the negotiation and execution of any lease" for which GSA "has obtained an appropriation sufficient to meet the Government's obligations under the lease." Letter for Rowland G. Freeman III, Administrator, GSA, from Jennings Randolph, Chairman, Senate Committee on Environment and Public Works, et al., at 1 (June 26, 1980) (GSA Letter, Ex. 7). The Senators stated that they would "not object" to GSA's proceeding on the basis of that interpretation. *Id.* And the Comptroller General has adopted the same interpretation. *See* 3 *Federal Appropriations Law* at 13-194 to -195 (describing the approval requirement as "a restriction on the appropriation of funds," and recognizing that "[l]imiting language in the approval is not legally binding unless incorporated" in legislation). When Congress is thus "aware of an administrative or judicial interpretation of a statute," it is "presumed . . . to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

## B.

In concluding that committee resolutions under section 3307(a) establish binding conditions on GSA's use of appropriated funds, the Court of Federal Claims relied upon section 3307(c), which grants the Administrator the authority to exceed the estimated maximum cost by 10 percent. *See Springfield Parcel*, 124 Fed. Cl. at 186. The court reasoned that such

---

reflection, have concluded that they were incorrect in suggesting that section 3307(a) constitutes a legislative veto, rather than merely an internal constraint on the appropriations process.

[6] *See, e.g.*, Federal Assets Sale and Transfer Act of 2016, Pub. L. No. 114-287, § 17, 130 Stat. 1463, 1476; Energy Independence and Security Act of 2007, Pub. L. No. 110-140, § 323, 121 Stat. 1492, 1589–90; Public Buildings Amendments of 1988, Pub. L. No. 100-678, §§ 2, 3(a), 102 Stat. 4049, 4049.

express authority to deviate from the cost cited in the approved prospectus implies the absence of authority to deviate from any other conditions set forth in the prospectus. We disagree with that interpretation.

Section 3307(c) provides that "[t]he estimated maximum cost of any project approved under this section as set forth in any prospectus may be increased by an amount equal to any percentage increase, as determined by the Administrator, in construction or alteration costs from the date the prospectus is transmitted to Congress," but that the "increase authorized by this subsection may not exceed 10 percent of the estimated maximum cost."

In *Springfield Parcel*, the court assumed that section 3307(c) regulates how GSA may expend appropriated funds and concluded that the "exception" in section 3307(c)—permitting GSA to depart from the "estimated maximum cost" in the prospectus—implies that the specifications in a prospectus approved under section 3307(a) are binding on GSA. *See* 124 Fed. Cl. at 186. But the court's premise is questionable. While section 3307(c) does not itself mention the appropriations process, it plainly refers to the subsections that do. Section 3307(c) addresses the "estimated maximum cost . . . as set forth in [the] prospectus" and refers to projects "approved under this section." Insofar as the section 3307(a) approval and the section 3307(b) prospectus concern when "appropriations may be made," section 3307(c) would most naturally be read to address when Congress may appropriate funds beyond the initial estimate of the maximum cost of the project without the need for the committees to review another prospectus.[7] Although the GSA Administrator may determine when the project overruns its initial costs, it does not follow that section 3307(c) specifically regulates the actions of GSA. To the contrary, the Administrator could spend additional funds on the project only if they were or had been appropriated in the first place.[8]

---

[7] The Comptroller General appears to have adopted the same reading we find most natural. *See* 3 *Federal Appropriations Law* at 13-194 ("The project cost may be increased by up to 10 percent of the prospectus estimate without having to submit a revised prospectus."); *see also* 105 Cong. Rec. 12,987 (1959) (statement of Rep. Mack) ("If the maximum costs of construction or alteration should, due to price advances, be increased by more than 10 percent, the Administrator must secure further additional authorization of the congressional committees.").

[8] Congress has included in annual appropriations acts a provision permitting GSA to exceed by 10 percent the amount otherwise appropriated for line-item projects, assuming

For these reasons, we disagree with the *Springfield Parcel* court's interpretation of section 3307(c). In any event, we do not believe that any ambiguity in subsection (c) would weigh in favor of a different interpretation of subsection (a). *See, e.g.*, *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1342 (Fed. Cir. 2004) (noting that "a vague implication in" one statutory subsection "cannot override the unambiguous language in the remainder of the section"). The language of section 3307(a) plainly establishes a prerequisite to enacting "appropriations" and not a limit on what GSA may do with appropriated funds. The language now found in section 3307(c) has coexisted with the "no appropriation" clause since the Public Buildings Act was first enacted in 1959, yet it has never been thought to make the committees' approval binding on GSA. *See* Pub. L. No. 86-249, § 7(b), 73 Stat. at 480. The language of section 3307(c) does not override the unambiguous language of section 3307(a) itself.

## C.

Finally, even if section 3307 were ambiguous, principles of constitutional avoidance would counsel in favor of our longstanding interpretation. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). If section 3307(a) were read to mean that committee resolutions approving a prospectus may bind GSA's use of appropriated funds, then section 3307(a) would operate as an unconstitutional legislative veto.

Federal legislative power must "be exercised in accord with a single, finely wrought and exhaustively considered, procedure": the bicameralism and presentment procedure specified in Article I. *INS v. Chadha*, 462 U.S. 919, 951 (1983). "Congress may not delegate the power to legislate to its own agents or to its own Members." *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252,

---

funds are available. GSA Letter at 6; *see, e.g.*, Financial Services and General Government Appropriations Act, 2015, 128 Stat. at 2360–61 ("*Provided*, That each of the foregoing limits of costs on new construction and acquisition projects may be exceeded to the extent that savings are effected in other such projects, but not to exceed 10 percent of the amounts included in a transmitted prospectus, if required[.]"). The inclusion of such a proviso suggests that Congress itself does not view section 3307(c) as already regulating GSA's ability to spend appropriated funds in excess of the estimated maximum cost in a prospectus.

275 (1991) ("*MWAA*"); *see also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 136 (1996) ("[T]he requirement of bicameralism and presentment is infringed whenever a single house, committee, or agent of Congress attempts to direct the execution of the law[.]"). Instead, "when Congress 'takes action that has the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch,' it must take that action by the procedures authorized in the Constitution." *MWAA*, 501 U.S. at 276 (brackets omitted; quoting *Chadha*, 462 U.S. at 952).

Section 3307(a) would violate those precepts if—contrary to our view—it were read to empower two congressional committees to control GSA's use of previously appropriated funds. "Such legislative action cannot be validly accomplished by mere committees of the Congress." *Severability and Duration of Appropriations Rider Concerning Frozen Poultry Regulations*, 20 Op. O.L.C. 232, 234 (1996); *see also Constitutionality of Committee Approval Provision in Department of Housing and Urban Development Appropriations Act*, 6 Op. O.L.C. 591, 592 (1982) ("[C]ommittees of Congress may not, by the approval resolution mechanism contemplated by the HUD appropriations statute, control the execution of the laws by an executive agency[.]"); *Am. Fed'n of Gov't Emps. v. Pierce*, 697 F.2d 303, 305–06 (D.C. Cir. 1982) (per curiam) (holding committee-approval requirement unconstitutional). Section 3307(a) would run afoul of the same constitutional prohibition were it read to give binding force to committee resolutions that were never adopted by both Houses of Congress and presented to the President.

We therefore disagree with the footnote in *Springfield Parcel* concluding that committee resolutions under section 3307(a) may establish binding conditions on the use of appropriated funds without violating *Chadha*. *See* 124 Fed. Cl. at 186 n.23. Raising the question *sua sponte*, the claims court reasoned that such resolutions "precede, not follow, the pertinent appropriation," and therefore that "any conditions stated in the committees' approving resolutions flow through to the appropriation." *Id*. at 187 n.23.[9] But mere "[e]xpressions of committees" during the legislative

---

[9] In support of its reading, the court cited a post-*Chadha* letter from the Comptroller General. *See Letter to Silvio O. Conte, Ranking Minority Member, House Committee on Appropriations*, B-196854, 1984 WL 262173 (Comp. Gen. Mar. 19, 1984). That letter, however, did not support the court's conclusion that committee-approval resolutions

process "cannot be equated with statutes enacted by Congress." *TVA v. Hill*, 437 U.S. 153, 191 (1978); *see also Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993) (explaining that statements in committee reports "do not establish any legal requirements on the agency" when Congress appropriates lump-sum amounts (internal quotation marks omitted)). Nor may Congress decree in advance that committee resolutions, which are neither approved by both Houses nor presented to the President, will automatically "flow through" to future appropriations. "[W]hen Congress legislates, when it makes binding policy, it must follow the procedures prescribed in Article I." *MWAA*, 501 U.S. at 274 n.19 (internal quotation marks omitted). If Congress sought to impose conditions specified in committee resolutions to limit the Executive Branch's use of appropriated funds on the basis of conditions in committee resolutions, then it would be obliged to identify those conditions in legislation, either in the text of the statute or by incorporating their terms by reference. *See, e.g.*, *Hershey Foods Corp. v. U.S. Dep't of Agriculture*, 158 F. Supp. 2d 37, 40–41 (D.D.C. 2001) (holding that *Chadha* is not violated when a law incorporates a prior unenacted bill by reference, as long as the law was enacted in accordance with the bicameralism and presentment requirements). Congress may not, however, give a committee resolution or report the force of law when the appropriations law actually enacted is silent with respect to the resolution or report. These constitutional concerns provide all the more reason to read section 3307(a) as establishing merely an internal constraint on the appropriations process.

## III.

For similar reasons, we conclude that when Congress appropriates funds for prospectus-level projects, those appropriations make funds available to GSA without regard to whether the committees have approved them under section 3307(a). According to GSA, Congress regularly appropriates funds for prospectus-level projects "for which the re-

---

"flow through" to any future appropriations. Instead, the letter concluded that "a convincing argument may be made" in support of a committee-approval requirement "for obligations or expenditures beyond those clearly authorized by the appropriations acts." *Id.* at *3. Moreover, subsequent guidance from the Comptroller General squarely contradicts the court's reading of the Public Buildings Act. *See* 3 *Federal Appropriations Law* at 13-195.

quirements of section 3307 have not been met." GSA Letter at 5 n.8 (citing examples). Once Congress has appropriated the funds, section 3307(a) does not constrain GSA's use of them consistent with the terms of the applicable appropriations law.

As noted above, section 3307(a) should be regarded as an internal directive to the relevant appropriations committees. If a proposed appropriation does not comply with those procedures, the statute "provide[s] a member of Congress the right to interpose a point of order" in objection. Letter for James T. McIntyre, Jr., Acting Director, Office of Management and Budget, from Patricia M. Wald, Assistant Attorney General, Office of Legislative Affairs, at 1 n.* (Nov. 25, 1977). But the procedures are not self-implementing. No member is obligated to raise such points of order, and, even when raised, they may be overruled. *See* 2 *Federal Appropriations Law* at 2-20 to -21 & n.25 (4th ed. 2016) (explaining that points of order can "[u]sually . . . be waived by a simple majority vote"); *see also* Thomas J. Wickham, *Constitution, Jefferson's Manual, and the Rules of the House of Representatives*, H.R. Doc. No. 114-192, §§ 1043–44, at 871–75 (2017) (discussing House rules for points of order against unauthorized appropriations); Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices*, S. Doc. No. 101-28, at 150–52, 210 (1992) (discussing Senate rules). In any event, Congress always has the power to disregard section 3307(a)'s limitation and appropriate funds for prospectus-level projects that have not received the committee approval that the statute purports to require. That conclusion is compelled by the fundamental principle that "statutes enacted by one Congress cannot bind a later Congress, which remains free to . . . exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012).

When Congress wields that power, "the committees' failure to approve a prospectus is without any legal significance, because if Congress in fact appropriates funds for a project, the Executive Branch may legally expend those funds notwithstanding the failure of the committees to approve that project prior to the appropriation." Letter for Allie B. Latimer, General Counsel, General Services Administration, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, at 2 (Sept. 27, 1983). The general counsel of GSA made this point in the 1959 hearings on the Public Buildings Act, and we have consistently endorsed it. *See*

Rehnquist Memorandum, 1 Op. O.L.C. Supp. at 301 (explaining that "if Congress passes general, unspecified . . . appropriations, . . . the Executive is entitled to treat this money as finally appropriated and allocable to projects which have not received committee approval"); *supra* note 5 (citing other opinions). And the Comptroller General has repeatedly adopted the same construction. *See* Letter for Daniel Patrick Moynihan, United State Senate, from R.F. Keller, Acting Comptroller General, at 2 (Sept. 27, 1978) ("[I]f the Congress, notwithstanding the [committee-approval] restriction in question, appropriates funds to GSA for the projects, we would not question the use of the funds for the purposes appropriated, such appropriations being the latest expression of congressional intent."); 3 *Federal Appropriations Law* at 13-195 ("If GSA does not comply with the prospectus approval requirement and Congress chooses to appropriate the money anyway, the appropriation might be subject to a point of order, but it would be a perfectly valid appropriation if enacted.").

Finally, we believe that our interpretation of section 3307 is buttressed by the fact that annual appropriations acts sometimes include a rider that purports directly to bar GSA from using lump-sum appropriations for certain projects that have not received committee approval. The Fiscal Year 2016 provision, for instance, prohibited the use of appropriations "for expenses of any construction, repair, alteration and acquisition project for which a prospectus, if required by 40 U.S.C. 3307(a), has not been approved" (except for the expenses associated with preparing a prospectus). Financial Services and General Government Appropriations Act, 2016, 129 Stat. at 2453; *see also, e.g.*, Financial Services and General Government Appropriations Act, 2015, 128 Stat. at 2362 (same); Financial Services and General Government Appropriations Act, 2014, Pub. L. No. 113-76, div. E, tit. V, 128 Stat. 5, 184, 214 (same). Such a proviso would be unnecessary if section 3307(a) itself already imposed mandatory conditions upon the use of those appropriations for a project without an approved prospectus.[10]

---

[10] We note that the constitutionality of such an appropriations rider would depend upon whether it merely incorporated existing committee approvals by reference, or instead purported to grant individual congressional committees the authority to control the use of already-appropriated funds through future committee actions. *See supra* Part II.C (discussing impermissible legislative vetoes). The Fiscal Year 2016 provision quoted in the

## IV.

Our conclusion with respect to section 3307 also means that GSA would not violate the Anti-Deficiency Act, 31 U.S.C. § 1341, if it were to expend appropriated funds in a manner inconsistent with a committee approval resolution. As noted above, the Court of Federal Claims in *Springfield Parcel* concluded that section 3307(a) "committee resolutions create[] binding conditions upon the availability of appropriations" and therefore that funds are "'available in an appropriation or fund'" within the meaning of the Anti-Deficiency Act only to the extent that GSA complies with the committee resolutions. 124 Fed. Cl. at 189 (quoting 31 U.S.C. § 1341(a)(1)(A)). GSA contends that the court misunderstood that, under 40 U.S.C. § 592, the Federal Buildings Fund will make funds "available" under the Anti-Deficiency Act without regard to the putative limitations in committee resolutions. GSA Letter at 9–10. We see no need to address that theory, however. In our view, the Anti-Deficiency Act discussion in *Springfield Parcel* is unpersuasive for a simpler reason: The court's premise regarding section 3307(a) resolutions was incorrect. Committee resolutions adopted in accordance with section 3307(a) do not establish binding conditions on GSA's use of appropriated funds and, therefore, have no effect on the availability of appropriated funds for purposes of the Anti-Deficiency Act.

CURTIS E. GANNON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

text does not appear to apply to leasing projects like the one at issue in *Springfield Parcel*, because it concerns expenses associated with "construction, repair, alteration and acquisition project[s]," which are covered by section 3307(a)(1), rather than leases covered by section 3307(a)(2). That distinguishes it from similar provisos that Congress previously enacted, which expressly included leases along with construction and other projects. *See, e.g.*, Independent Agencies Appropriations Act, 1994, Pub. L. No. 103-123, tit. IV, 107 Stat. 1226, 1238, 1243–44 (1993). Because the recent form of the appropriations rider does not apply to the *Springfield Parcel* lease that occasioned the request for this opinion, we do not address its lawfulness.